**TRIGON INSURANCE COMPANY (Formerly Blue Cross and Blue Shield of Virginia), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 3:00cv365.

United States District Court, E.D. Virginia, Richmond Division.

Aug. 9, 2002.

See also, 204 F.R.D. 277.

Gilbert E. Schill, McGuireWoods, LLP, Richmond, VA, James D. Bridgeman, McKee, Nelson, Ernst & Young, LLP, Washington, D.C., for Plaintiff.

Debra J. Prillaman, M. Hannah Lauck, United States Attorney's Office, Richmond, VA, Angelo Frattarelli, C. Paul Hurley, United States Department of Justice, Tax Division, Washington, D.C., Carolyn V. Grady, Epperly, Follis & Schork, P.C., Richmond, VA, for Defendant.

Stephen W. Miller, United States Attorney's Office, Richmond, VA, for Government.

## MEMORANDUM OPINION

PAYNE, District Judge.

Plaintiff, Trigon Insurance Company ("Trigon"), formerly known as Blue Cross and Blue Shield of Virginia, filed this action to recover federal income taxes, plus interest, alleged to have been erroneously overpaid in the years 1989 through 1995. The United States opposes the refund on several grounds.

The dispute between the parties is over the meaning and effect of certain sections of the Tax Reform Act of 1986 (the "1986 Act")[1] which, for the first time, subjected Blue Cross and Blue Shield health care insurance organizations to federal income taxation. The core issues are matters of first judicial impression and, therefore, it is useful to recount the factual background in which those issues arose as well as the background of the 1986 Act.

## I. BACKGROUND

### A. The Evolution Of The Blue Cross/Blue Shield Organizations In Virginia, The Competition Between Them And Their Merger To Form What Is Now Trigon

Trigon's two corporate predecessors, both Blue Cross and Blue Shield organizations (hereinafter referred to as "Blue Cross/Blue Shield"), were incorporated in the Commonwealth of Virginia in 1935 and 1945, respectively. During the years before 1986, three separate Blue Cross/Blue Shield plans operated in Virginia: Blue Cross/Blue Shield of the National Capital Area in northern Virginia (the "DC Plan"), Blue Cross/Blue Shield of Virginia in the eastern and central portions of Virginia (the "Richmond Plan"), and Blue Cross/Blue Shield of Southwestern Virginia (the "Roanoke Plan"). The relationship among these three companies was governed, in part, by the separate license agreements between each plan and the Blue Cross/Blue Shield Association ("BCBSA"). The BCBSA licensed the rights to use the Blue Cross name and service mark and the Blue Shield name and mark under separate agreements.

Before 1986, the Richmond and Roanoke Plans operated independently in the territory that Trigon now controls. Before 1983, competition between the Richmond and Roanoke plans was prohibited by state law. Thus, each plan operated exclusively in different geographic regions. In 1983, the Virginia legislature amended the state law to eliminate the territorial restrictions on the activities for the Richmond and Roanoke Plans, thereby allowing the two plans to compete directly against each other. As a result of the change, beginning in approximately July of 1983, the two plans engaged in a period of unusually intense competition. This fierce "interplan competition" was conducted principally by offering significant premium discounts in an effort to penetrate, and to establish a significant presence in, the territory formerly occupied exclusively by the rival plans. To that end, both the Richmond and Roanoke Plans offered sizeable competitive premium discounts that were lower than the premiums otherwise set by the actuarial and underwriting departments. The Roanoke Plan, which was smaller than the Richmond Plan, was the more aggressive of the two; and many of the discounted premiums offered by the Roanoke Plan were so significant that the premiums were insufficient to cover the claims and administrative costs expected under the contracts. The Richmond Plan tracked its discounts on an account-by-account basis, keeping records reflecting the difference between the premiums actually charged and those that would have been charged,

---

1. Pub.L. No. 99–514, 100 Stat.2085 (1986), now codified as 26 U.S.C. § 833.

but for the competition. The Roanoke Plan did not do that.

The intensity of the interplan competition was so great that the commercial health insurers operating in Virginia ceased active marketing within the geographic regions covered by the two plans during this period. As a result of their aggressive pricing strategies during the interplan competition and the corresponding absence of competition from commercial insurers, total enrollment for both the Richmond and Roanoke Plans grew during the period 1983 to 1985.

By late 1985, however, the Roanoke Plan was near financial collapse as a result of the interplan competition and its unsound pricing policies. Consequently, the Roanoke Plan approached the Richmond Plan with a proposal to consolidate. In September 1985, the Plans entered into an affiliation agreement and formally merged in March 1986. Trigon formed Consolidated Healthcare, Inc. ("CHI") in early 1986 as an affiliated management company to facilitate the merger between the two plans. The consolidation began in early 1986 and was not completed until the middle of 1987. Following the merger, the combined company began to manage the Roanoke Plan's business by offering the same products and using the same pricing methodology that the Richmond Plan used. Wood Tr. 11/15/01 855:5-18.[2]

## B. The 1986 Act And Trigon

The merged company immediately faced a changed tax landscape. Specifically, before 1987, Blue Cross/Blue Shield organizations were exempt from federal income tax pursuant to sections 501(a) and (c) of the Internal Revenue Code of 1954 ("I.R.C." or "the Code"). As part of the 1986 Act, Congress determined that Blue Cross/Blue Shield organizations should become subject to federal income taxation beginning with their first taxable years after December 31, 1986. Congress implemented this decision by enacting section 501(m) of the Code. When it subjected Blue Cross/Blue Shield organizations to income tax, Congress enacted a number of transitional rules, including section 1012(c)(3)(A)(ii) of the 1986 Act (the "Fresh Start Basis Rule") which provides that:

> for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day.

The purpose behind the Fresh Start Basis Rule was to prevent any unrealized gain or loss that had accrued while a Blue Cross/Blue Shield organization was exempt from tax from being factored into the determination of tax liability once it became a taxpayer. See H.R. Conf. Rept. 814, 99th Cong., 2d Sess. Vol. II at 350, reprinted in 1986 U.S.C.C.A.N. 4075, 4437–38 ("The basis adjustment is provided because the conferees believe that such formerly tax-exempt organizations should not be taxed on unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation."). By requiring that the basis of each asset held on January 1, 1987 be adjusted to its fair market value on that date, the Fresh Start Basis Rule ensures that taxable income or loss of a Blue Cross/Blue Shield organization will be based solely on items of income and loss that economically accrue after the organi-

---

**2.** Trigon was reorganized as a mutual insurance company in 1990. In 1996, Trigon demutualized and, in connection with an initial public offering of stock, it became a wholly owned subsidiary of Trigon Healthcare, Inc., and changed its name to Trigon Insurance Company.

zation became subject to federal income tax.

Trigon's taxable year coincides with the calendar year, thus its first taxable year beginning after December 31, 1986, was the calendar year that began January 1, 1987. Pursuant to the Fresh Start Basis Rule, Trigon's basis in each asset owned on January 1, 1987, was equal to the asset's fair market value on that date.

In 1987, after the merger of the two Plans and after the 1986 Act took effect, Trigon began to identify its assets so as to apply the Fresh Start Basis Rule in filing federal income tax returns. This task was assigned to Stephen Meyer, director of corporate tax, who undertook to "understand the new tax law and its ramifications and implications to the plan and to explain that to management." Meyer Tr. (11/13/01) 342:2–4. As a result, by late 1987 or early 1988, Trigon had identified as among its assets, the contracts with subscribers (Trigon's customers) and providers (the doctors and hospitals who agreed to provide service to Trigon subscribers). Meyer Tr. (11/13/01) 345:23–346:2; 347:1–2.

Trigon has claimed, at various times that, on January 1, 1987, it owned between 20,000 and 24,000 group health insurance subscription contracts organized into the following lines of business: (1) Community Rated groups; (2) Local Experience Rated contracts; (3) Local Cost plus contracts; (4) Small Business contracts; (5) Control National contracts; (6) Participating National contracts; (7) the State of Virginia account; (8) the Federal Employee Program; and (9) Large Accounts (Local Experience Rated, Control National, and Local Cost Plus). Defense Exh. 103 at TR46012165.

Even now, after extensive and exhaustive pre- and post-trial briefing, as well as teleconferences on this point, the precise number of group subscriber contracts ac-

tually owned by Trigon as of January 1, 1987 is difficult of ascertainment. For example, in its Proposed Findings of Fact ¶ 19, Trigon said that it owned 23,780 subscriber contracts which included a number of "sub-contracts," thereby reducing to 21,-642 contractual relationships with subscriber groups. Trigon's valuation expert valued 22,509 subscriber contracts. At trial, a Trigon witness said that the number ought to be reduced by "at least" or "approximately" 500. Hunt Tr. (11/13/01) 448:9–449:18. When, in August 2002, Trigon was asked to supply citations in the record to document the number of subscriber contracts owned, Trigon responded in a letter dated August 6, 2002, that the 22,509 number used by the valuation expert ought to be reduced, and not by 500, but by 793. Thus, as of August 6, 2002, Trigon claims that the number of subscriber contracts actually owned on January 1, 1987, was 21,716. *See* Letter from Gilbert E. Schill, Jr., counsel for Trigon, dated August 6, 2002.

Trigon also carried contracts with physician and hospital providers of health care services. These provider contracts allowed Trigon to reimburse the physicians and hospitals at rates below what the providers typically charge for their services. Having a broad provider network was also a significant factor in marketing Trigon's health insurance contracts. *See* Bilbray Tr. (11/16/01) 1178:14–23; Slone Tr. (11/13/01) 311:13–312:9. Trigon had two types of contracts with physician providers, "Key Care" contracts and "Participating" contracts. In some instances, Trigon owned both Key Care and Participating provider contracts with the same physician. The total number of physicians with whom Trigon owned provider contracts on January 1, 1987 (either Key Care, Participating or both), was 9,436.

Trigon's provider contracts with hospitals and other health care facilities, included a contract with Smyth County Community Hospital, under which those facilities agreed to provide health care services to Trigon's members in exchange for negotiated payments. The total number of hospital or health care facility provider contracts was 278.

From time to time after January 1, 1987, these contracts were terminated, most often by the subscriber or provider, but occasionally by Trigon. When filing its federal income tax returns for the years 1987 through 1995, Trigon did not claim as losses the value of contracts terminated in any of those nine years. However, on November 14, 1996, Trigon filed amended federal income tax returns for the years 1987 through 1995 claiming loss deductions for the value of contracts terminated in the years 1987 through 1995.[3]

In explaining why Trigon did not initially claim these terminated contracts as loss deductions, Phyllis Cothran, Trigon's Chief Financial Officer at the time, testified that "there was so little guidance from the IRS at that time as to how to proceed with those type deductions that Steve Meyer had talked to me about that and said with everything, that we should move slowly and cautiously and wait until guidelines were issued and wait until we understood those and work with other Blue Cross Blue Shield plans and any outside expertise that he needed." Cothran Tr. (11/12/01) 220:3–11. "[W]e weren't going to do anything until we'd had more time to think about it, wiser minds had more time to look at it." Cothran Tr. (11/12/01) 266:23–267:1. The company's records, accounting or otherwise, contain no statements setting forth the company's views of these contracts, or their value, at or about the time that Trigon became subject to taxation, January 1, 1987.

In 1988, at Trigon's request, Arthur Andersen performed a fair market valuation of personal property and intangible assets owned by Trigon on January 1, 1987. *See* Defense Exh. 25. The valuation attributed a value of $1,325,543,000 to Trigon's subscriber contracts and $265,580,000 to the contracts that constituted Trigon's provider network. Defense Exh. 25 at TR01020028. Arthur Andersen, in valuing the subscriber contracts, used the income approach and discounted cash flow method,[4] calculating the average remaining life of the contracts, the income associated with the contracts in the future, and discounting the premiums back to present value as of January 1, 1987, with a discount rate identical to the one used by Michael C. Wierwille, Trigon's valuation expert in this action. Defense Exh. 25 at TR01020038–39.

Arthur Andersen also used the income approach in arriving at a value for the provider contracts. Using the cost savings of each of the physician and facility contracts, Arthur Andersen determined that the value of the physician provider contracts was $194,811,000 and the value of the facility provider contracts was $70,769,000, for a total of $265,580,000. Defense Exh. 25 at TR01020040.

## C. The 1996 Claim To Refund And This Action

In November 1996, Trigon timely filed administrative claims for refund pursuant to 26 U.S.C. § 6511 for the 1989 through

---

**3.** Trigon owed no taxes in 1987 and 1988 by virtue of deductions not here relevant. However, in the 1996 amended tax returns, Trigon carried forward the losses from contract terminations in 1987 and 1988.

**4.** The same methodology used by Plaintiff to value the subscriber contracts in this action. These techniques are described later in this Memorandum Opinion.

1995 tax years with respect to loss deductions arising from the cancellation, abandonment or termination of indemnity group health insurance subscription contracts, physician provider contracts and a hospital provider contract. The claimed deductions were based in part on the values of the terminated contracts described by Arthur Andersen in 1988. Meyer Tr. (11/16/01) 1114:2–23. The Internal Revenue Service ("IRS") denied those claimed deductions though it had agreed to apply the Fresh Start Basis Rule to some of Trigon's other internally developed intangible assets at an earlier point; namely, Trigon's internally developed computer software. *See* Technical Advice Memorandum 9533003 (May 2, 1995). Eventually, Trigon and the IRS reached a compromise on the treatment of losses arising in connection with the subscriber and provider contracts. However, the Congressional Joint Committee on Taxation effectively rejected that agreement. The administrative claims were subsequently denied by the IRS and Trigon filed this action seeking a refund.

The Complaint seeks a refund in the amount of "at least $61,649,000" but, by agreement, the sum sought just before trial was adjusted to $35,188,255. After

Trigon produced a revised valuation of the subscriber contracts at trial (*see* Plaintiff's Exh. 282A) prepared by Wierwille, Trigon's valuation expert,[5] Dennis van Miegham, Trigon's tax computation expert, submitted a revised refund amount of $33,181,966.[6] Plaintiff's Exh. 297A.

The basis for the loss deduction claimed by Trigon and disallowed by the IRS are Trigon's contentions that, on January 1, 1987:

(1) Trigon owned 22,509 group health insurance subscription contracts, and that between January 1, 1987, and December 31, 1995, 15,998 of the contracts were lost, the estimated loss, measured by the fair market value of such contracts on January 1, 1987, being $175,147,656;[7] and

(2) Trigon owned provider contracts with 9,436 physicians, each of whom held a "Participating" contract, a "Key Care" contract or both, and that between January 1, 1987, and December 31, 1995, 3,381 of the contracts were lost, the estimated loss, measured by the fair market value of such contracts on January 1, 1987, being $207,896; and

---

5. Wierwille revised his report after reviewing deposition transcripts and information that became available through those transcripts. Wierwille Tr. (11/14/01) 566:18–24. He made two adjustments, one relating to the competitive discounts granted as a result of the inter-plan competition, *see infra,* added back to the management financial projections, the other relating to the management fee which was being charged to Blue Cross Blue Shield of Virginia by CHI. Wierwille Tr. (11/14/01) 566:24–568:6. The effect of those adjustments was to reduce the values on a per contract basis ranging from 3 to 7 percent. *Id.*

6. As noted previously, during the 1987 and 1988 tax years, Trigon's income was fully offset by deductions unrelated to this case.

Accordingly, Trigon paid no income tax in those years and they are not included in this lawsuit. The 1987 and 1988 tax years are relevant to this case, however, in that the losses Trigon incurred from the alleged cancellation, abandonment or termination of its subscriber and provider contracts resulted in net operating losses that can be carried forward and used to offset income in later years. *See* I.R.C. (26 U.S.C.) § 172.

7. This value is associated with Wierwille's original valuation. Plaintiff's Exh. 282. Wierwille's subsequent revised opinion did not explicitly state the revised value of the lost contracts (*see* Plaintiff's Exh. 282A); however, such value was appropriately figured into van Miegham's revised tax refund computation, Plaintiff's Exhibit 297A.

(3) Trigon also owned contracts with hospitals and other health care facilities throughout Virginia, many of which had multiple contracts with Trigon and that the contract with Smyth County Community Hospital was lost between January 1, 1987, and December 31, 1995, the estimated loss, measured by the fair market value of the contract on January 1, 1987, being $36,507.

In essence, Trigon's Complaint presents the following basic theory in support of its claim for refund: On January 1, 1987, Trigon owned intangible assets in the form of health insurance subscriber and provider contracts; each of those contracts had a determinable fair market value on January 1, 1987; some of the contracts owned by Trigon on January 1, 1987, were lost by virtue of contract terminations during the 1987 through 1995 tax years; and the tax deductions for losses arising from the terminated contracts translate into federal income tax refunds for the 1989 through 1995 tax years.

The United States argues that, as a matter of law, the stepped-up basis provided by § 1012(c)(3)(A) is not available for tax deductions based on the alleged "cancellation, abandonment or termination" of the contracts at issue; and further: (1) that Trigon did not establish that the "cancellation, abandonment or termination" of Trigon's contracts constituted a tax deductible loss under the Internal Revenue Code; (2) that, because there is no market for the individual contracts, no fair market value can be ascertained; (3) that each contract is not an individual asset and

cannot be valued separately; and (4) that Trigon did not meet its burden to prove, by a preponderance of the evidence, a reliable value for the contracts it owned as of January 1, 1987.[8]

The facts found above will be used in resolving the several issues presented for decision. However, most of the issues require further factual findings and those findings will be made as part of the discussion of the issues to which they relate.

## II. DISCUSSION

### A. Section 1012(c) Of The 1986 Act Gave Trigon A Fresh Start Basis In All Of Its Assets As Of January 1, 1987, Including The Subscriber And Provider Contracts At Issue Here

When, by enacting the 1986 Act, Congress implemented its determination that Blue Cross/Blue Shield organizations should become subject to federal income taxation beginning with their first taxable year beginning after December 31, 1986, Congress also enacted a series of other statutory provisions that prescribe with considerable specificity the manner in which the transition of Blue Cross/Blue Shield organizations from nontaxable status to taxable status would occur. Among the detailed rules that Congress provided for the transition of Blue Cross/Blue Shield organizations to taxable status is the Fresh Start Basis Rule, which states:

> [F]or purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year [the first taxable year beginning after De-

---

**8.** The United States raised a number of other issues and two affirmative defenses: (1) applying the concept of substance over form, the United States contends that Trigon's purported losses are actually depreciation deductions; and (2) that Trigon asserted its purported losses for the first time in its amended returns, and, in doing so, Trigon changed its method of accounting, an action for which it required, but did not have, the Internal Revenue Service's permission. The resolution of Trigon's claims on the grounds set forth in this Memorandum Opinion make it unnecessary to address the sundry other issues raised by the United States or its affirmative defenses.

cember 31, 1986] shall be treated as equal to its fair market value as of such day.

26 U.S.C. § 1012(c)(3)(A)(ii).

Before assessing Trigon's claim for refund, it is necessary to confront several threshold issues presented by the United States.

### 1. Are Trigon's Subscriber And Provider Contracts Assets?

From time to time in this action, the United States has asserted that Trigon's subscriber and provider contracts are not assets and, for that reason alone, they are not amenable to treatment under the Fresh Start Basis Rule. Most recently, the United States appears to have eschewed this categorical theory and, instead, has adopted the refinement that the individual contracts are not assets because there is no market for individual contracts of this sort. This, in turn, says the United States, forecloses a fair market value of the individual contracts. That issue will be considered later in this Memorandum Opinion, but, to the extent that the United States continues to press the categorical assertion that individual contracts cannot be assets at all, the theory is rejected as erroneous.

■ By its terms, the Fresh Start Basis Rule applies to "any asset" held by Trigon on January 1, 1987. The term "asset" means "[a]n item of value owned." *Webster's Third New International Dictionary,* 131 (3d Ed.1986). The Tax Court has held, and the IRS has acknowledged, that contracts similar to Trigon's subscriber contracts, are assets for federal income tax purposes. *See Union Bankers Ins. Co. v. Commissioner,* 64 T.C. 807, 1975 WL 3176 (1975), *acq.,* 1976–2 C.B. 3; Rev. Rul.

76–411, 1976–2 C.B. 208, 1976 WL 36762. Furthermore, courts have treated other types of contractual relationships as separate assets, whether or not evidenced by a written contract. *See, e.g., Super Food Services, Inc. v. United States,* 416 F.2d 1236 (7th Cir.1969) (treating distributor contracts as separate assets); *Commissioner v. Seaboard Finance Corp.,* 367 F.2d 646 (9th Cir.1966) (treating consumer loan contracts as separate assets); *Hoffman v. Commissioner,* 48 T.C. 176, 1967 WL 929 (1967) (treating contracts for the location of vending machines as separate assets); *North American Service Co. v. Commissioner,* 33 T.C. 677, 1960 WL 1066 (1960), *acq.,* 1960–2 C.B. 6 (holding that taxpayer was entitled to a fair market value basis in service contracts received upon liquidation of corporation); *Silling v. Commissioner,* 27 T.C. 701, 1957 WL 897 (1957) (holding that contracts for the performance of services were assets and thus entitled to a stepped-up basis when received by a partner upon termination of a partnership, even though contracts had a zero basis in the hands of the partnership).

■ Because Trigon's subscriber contracts produce value to the owner and they can be transferred for consideration, Trigon's subscriber contracts, both individually and in blocks, clearly are assets. The provider contracts are also assets to be considered because they too produce value, the value being a provider network that ultimately saves subscribers and Trigon money and attracts subscribers to the Company.[9]

### 2. The Fresh Start Basis Rule Applies To More Than Just Sales And Exchanges

The losses claimed by Trigon arise as a result of the termination or cancellation of

---

9. Such a provider network is also theoretically transferrable as part of a going concern

purchased by another company.

subscriber and provider contracts. In filing its Amended Tax Returns, Trigon represented to the IRS that "[a] deduction is being taken for abandonment of appraised assets that consist of terminated contracts." Plaintiff's Exhs. 1–5. In other words, Trigon seeks what has been termed an "abandonment loss deduction" that is permitted under I.R.C. § 165, as it is implemented by Treasury Regulation § 1.165–2(a) which provides in pertinent part that:

A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transactions of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained.

The next part of the Treasury Regulation expressly provides that "[t]his section does not apply to losses sustained upon the sale or exchange of property." Treas. Reg. § 1.165–2(b).

Citing that language and seizing upon one sentence in the legislative history of the 1986 Act stating that the Fresh Start Basis Rule applies only to determine a gain or loss on the sale or exchange of property, the United States argues that Trigon is not entitled to use the Fresh Start Basis Rule provided in § 1012(c)(3)(A) of the 1986 Act.

The linchpin of the argument presented by the United States is the Conference Report to the 1986 Act, which in the following passage headed "Basis of assets," states:

the basis of assets of such organizations is equal, *for purposes of determining gain or loss,* to the amount of the assets' fair market value on the first day of the organization's taxable year beginning after December 31, 1986. Thus, the formerly tax-exempt organizations utilizing a calendar period of accounting and whose first taxable year commences January 1, 1987, the basis of each asset of such organization is equal to the amount of its fair market value on January 1, 1987. *The basis step-up is provided solely for purposes or determining gain or loss upon sale or exchange of the assets, not for purposes of determining amounts of depreciation or for other purposes.* The basis adjustment is provided because the conferees believe that such formerly tax exempt organizations should not be taxed on such unrealized appreciation or depreciation that accrued during the period the organization was not generally subject to income taxation.

2 H.R. Conf. Rept. 841, 99th Cong.2d Sess. II–350 *reprinted in* U.S.C.C.A.N. 4075, 4437–38 (emphasis supplied).

Clearly, the language in the Conference Report is at odds with the statutory text that establishes the Fresh Start Basis Rule, which says that the step up in basis applies "for purposes of determining gain or loss," without in any way limiting the kind of gain or loss to be determined. The inconsistency must be resolved by resort to familiar rules of statutory construction. As explained below, when that is done, the argument of the United States fails.

 Statutory interpretation, of course, begins "by examining the statutory language, bearing in mind that [a court] should give effect to the legislative will as expressed in the language." *United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995) (citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)). The judicial task is to determine

whether the statutory "language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). And, the court's inquiry must end if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Id.* (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *Robinson v. Shell Oil Co.*, 70 F.3d 325, 329 (4th Cir. 1995) (*en banc*), *rev'd on other grounds*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). When the statutory language is "facially clear and 'within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.'" *Murphy*, 35 F.3d at 145 (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Here, there is no question of constitutional authority and thus the only question is the clarity of the statutory text.

■■■ To ascertain whether the statutory language is clear or ambiguous, the courts look to "the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. 337, 342, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991)). Words used by Congress are typically given their common usage meaning. *Murphy*, 35 F.3d at 145 (citing *Palestine Info. Office v. Shultz*, 853 F.2d 932, 938 (D.C.Cir.1988)).

■■ It is also true that Congress is presumed to know the existing statutory framework into which an amending statute fits. As the Supreme Court explained in *Molzof v. United States*, 502 U.S. 301, 307, 112 S.Ct. 711, 716, 116 L.Ed.2d 731 (1992), a cardinal rule of statutory construction holds that:

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Id.* (quoting *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952), and citing as additional authority *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981); *Braxton v. United States*, 500 U.S. 344, 351, n. *, 111 S.Ct. 1854, 1859, n. *, 114 L.Ed.2d 385 (1991)). Of course, the tax code is not centuries old, but it is nearing its first centennial anniversary and the principal recited by in *Molzof* is certainly applicable where, as here, the statutory scheme is well-settled and oft-addressed by Congress. *See United States v. Neustadt*, 366 U.S. 696, 707–08, 81 S.Ct. 1294, 1301, 6 L.Ed.2d 614 (1961) ("Certainly there is no warrant for assuming that Congress was unaware of established tort definitions when it enacted the Tort Claims Act in 1946, after spending 'some twenty-eight years of congressional drafting and redrafting, amendment and counter-amendment.'") (quoting *United States v. Spelar*, 338 U.S. 217, 219—220, 70 S.Ct. 10, 11, 94 L.Ed. 3 (1949)); *see also Molzof*, 502 U.S. at 307, 112 S.Ct. at 716.

The introductory clause of § 1012(c)(3)(A)(iii) articulates that its Fresh Start Basis Rule is to be used "for purposes of determining gain or loss." The statutory text imposes no limit on the kind of gain or loss to which the Fresh Start Basis Rule applies. The common usage of the words "gain or loss," without limitation, plainly includes *any* gain or loss. And, because the statute concerns specifically Blue Cross/Blue Shield organizations, that plain language means any gain or loss respecting Blue Cross/Blue Shield assets as to which gain or loss is pertinent in establishing federal income tax liability to which Blue Cross/Blue Shield organizations were, for the first time, being subjected. Thus, the statutory language at issue, given its ordinary meaning, is plain and unambiguous. Significantly, the United States does not contend otherwise.

■■■ Instead, the inconsistency relied on by the United States is created not by the text of statute but by a passage in the legislative history, which states the "basis step-up is provided solely for purposes of determining gain or loss *upon sale or exchange of the assets.*" 2 H.R. Conf. Rept. 841, 99th Cong.2d Sess. II–350 *reprinted in* U.S.C.C.A.N. 4075, 4437–38 (emphasis supplied). However, courts should not interpret a statute by reference to legislative history where, as here, the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Murphy,* 35 F.3d at 145 (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)). As explained above, the statutory text is clear and it does not support the statutory construction urged by the United States.

■■■ If it were necessary to go further (which it is not), it is clear that the plain statutory text is fully consistent with the statutory context of the provision at issue and is consonant with the purpose of the statute, namely, to prevent any unrealized gain or loss that had accrued while a Blue Cross/Blue Shield organization was exempt from tax from being included in the calculation of tax liability once the company became subject to tax. *See* H.R. Conf. Rept. 814, 99th Cong., 2d Sess. Vol. II at 350, *reprinted in* 1986 U.S.C.C.A.N. 4075, 4437–38. Moreover, the broader context of the 1986 Act was to subject Blue Cross/Blue Shield organizations taxable under federal tax law just as were the commercial insurers with whom the Blue Cross/Blue Shield organizations were in competition. That body of law includes a comprehensive set of rules respecting permissible loss deductions and nothing in the text of the Fresh Start Basis Rule or the 1986 Act suggests that Congress intended to make that body of rules, or any part of them, inapplicable to Blue Cross/Blue Shield organizations. It would be inconsistent with the Congressional objectives reflected in the 1986 Act to interpret § 1012(c)(3)(A)(ii) to impose limits on the kinds of gains and losses to which its *Fresh Start Basis Rules* apply.

This view of the statute is underscored by the familiar principle that Congress is presumed to be aware of existing statutory provisions when it enacts amending legislation. *See Molzof,* 502 U.S. at 307, 112 S.Ct. at 716; *Neustadt,* 366 U.S. at 707–08, 81 S.Ct. at 1301; *Spelar,* 338 U.S. at 219–20, 70 S.Ct. at 11. Nowhere is that concept more applicable than in the complex federal income tax statutes as to which Congress is often and extensively involved.

Without doubt, when Congress passed the 1986 Act, it was familiar with I.R.C. Section 165 and its implementing regulations permitting and regulating deductions for business losses. Thus, Congress was no doubt aware that Section 165 and its implementing regulations had long permit-

ted deductions for business losses other than those sustained on the sale or exchange of property.

If Congress had intended to limit application of the Fresh Start Basis Rule to gains or losses incurred in sale or exchange transactions, it certainly could have done so in the statute. Indeed, it would have been a simple matter to have included in the statute language such as that which appears in the Conference Report. Congress, however, did not do so and it is not the office of the judiciary to conclude that Congress inadvertently failed to include that significant limitation in the statutory text and then, as the United States urges, correct that oversight.

To follow that course here would be inappropriate for the additional reason that Congress is no stranger to enacting taxation statutes providing for a stepped up basis. Indeed, the Fresh Start Basis Rule is similar to other tax statutes enacted over the years that have permitted or required taxpayers to adjust asset basis to fair market value when the taxpayers became subject to tax. For instance, when first subjecting assets obtained before March 1, 1913, to taxation, an asset's basis for purposes of determining gain would be its fair market value as of March 1, 1913:

> In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subtitle, adjusted (for the period before March 1, 1913) as provided in section 1016, is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value.

26 U.S.C. § 1053. As a result of the adjustment in basis of assets acquired before March 1, 1913, taxpayers computed losses based on an asset's value as of such date, regardless of its original cost. *See Burnet v. Houston,* 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991 (1931); *Lucas v. Alexander,* 279 U.S. 573, 49 S.Ct. 426, 73 L.Ed. 851 (1929). As a consequence of this rule, any appreciation or gain in an asset that economically accrued prior to the enactment of the federal income tax was permanently excluded from income tax. 26 U.S.C. § 1053.

A more recent example of Congressional familiarity with the stepped-up basis for gains or losses when providing for the transition of an organization from tax-exempt to taxable status occurred when Congress eliminated the federal income tax exemption for the Federal Home Loan Mortgage Corporation ("Freddie Mac") in 1984. In doing so, Congress provided for an adjustment to the basis in each asset held by Freddie Mac on January 1, 1985. The statute provides that:

> [T]he adjusted basis of any asset of the Federal Home Loan Mortgage Corporation held on January 1, 1985, shall—
>
> (i) for purposes of determining any loss, be equal to the lesser of the adjusted basis of such asset or the fair market value of such asset as of such date, and
>
> (ii) for purposes of determining any gain, be equal to the higher of the adjusted basis of such asset or the fair market value of such asset as of such date.

Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 177(d)(2), 98 Stat. 494, 709–712 (1984).

Thus, the history of federal income tax legislation demonstrates that, when Congress has intended to limit the applicability of a transitional basis adjustment, it has employed specific language to do so. That certainly was the case before Congress passed the 1986 Act.

It was only two years after passing the Freddie Mac legislation that Congress enacted a different basis adjustment regime for Blue Cross/Blue Shield organizations.

In contrast to the Freddie Mac basis rule, the Fresh Start Basis Rule applies without regard to the asset's cost basis and requires use of the fair market value basis for purposes of determining loss as well as gain. It is not to be presumed that Congress was unmindful of the differing treatments it had given stepped-up basis provisions before the 1986 Act.

Furthermore, subsequent, but related events, are relevant to the analysis here. Specifically, it is important to recall that, when Congress subjected Blue Cross/Blue Shield organizations to tax under I.R.C. Section 501(m), Congress exempted the pension businesses of Mutual of America ("MOA") and the Teachers Insurance Annuity Association–College Retirement Equities Fund ("TIAA–CREF") from federal income tax. *See* 1986 Act §§ 1012(c)(4)(A), (B). However, in 1997, Congress eliminated the grandfather relief for MOA and TIAA–CREF, thereby subjecting those organizations to § 1012(c) of the 1986 Act, the same statutory provision that applies to Trigon. *See* Taxpayer Relief Act of 1997, Pub.L. No. 105–34, § 1042(b)(2), 111 Stat. 788 ("for purposes of determining gain or loss, the adjusted basis of any asset held on the 1st day of such taxable year shall be treated as equal to its fair market value as of such day."). At that time, Congress provided MOA and TIAA–CREF with a transition rule worded identically to the Fresh Start Basis Rule at issue here. The legislative history of the 1997 amendment describes the Fresh Start Basis Rule applicable to Blue Cross/Blue Shield organizations as applying "for purposes of determining gain or loss," making no reference to the "sale or exchange" limitation sought by the United States in this case. *See* H. Rep. No. 105–148, 105th Cong., 1st Sess. 495–96 (1997), U.S.Code Cong. & Admin.News 1997, 678, 889–90. The same legislative history also states that the rule for MOA and TIAA–CREF would apply "for purposes of determining gain or loss," again making no reference to the United States' "sale or exchange limitation."

Considering the plain and unambiguous statutory text, the context in which that language is used and the statutory framework of which it is a part, the Court would be rewriting the statute to give it the meaning urged by the United States. The statute means what it says, the Fresh Start Basis Rule applies in determining the gains or losses, incurred by Blue Cross/Blue Shield taxpayers, not just the gains or losses they incur on sales or exchanges of property.[10]

## B. The Challenge Of The United States To The Nature Of the Claimed Losses

Another threshold issue presented by the United States is whether the kind of loss claimed by Trigon is the kind of loss permitted by I.R.C. § 165. The first step in assessing that issue is to define the kind of loss claimed. In the Amended Tax Return that Trigon filed in November 1996, Trigon described the deduction as one that

---

10. The position of the United States also is inconsistent with the administrative practice of the IRS, which has acknowledged that the Fresh Start Basis Rule applies in a non-sale or exchange disposition of an asset to determine the amount of a loss recognized by a Blue Cross and Blue Shield organization under Section 165 of the Code. *See* Tech. Adv. Mem. 9533003 (May 2, 1995) (Internally developed computer software was allowed a fresh start basis according to its fair market value on January 1, 1987, as opposed to a cost basis under the same legislation at issue here. The IRS allowed the deduction though the software was obsolete and abandoned instead of sold or exchanged). Technical Advice Memoranda are not binding on the IRS, but they are informative of its interpretation of the statute at issue in this litigation.

was "being taken for abandonment of appraised assets that consist of terminated contracts . . . ." Plaintiff's Exhs. 1–5.

The principal statutory authorization for the deductibility of losses generally is found in I.R.C. § 165(a), which provides: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(b) provides that "the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in Section 1011 for determining the loss from the sale or other disposition of property." Under Section 1011 of the Code and its implementing regulations, a taxpayer's gain or loss from any sale or other disposition of an asset is to be determined under the general provisions of the Code, *or as otherwise specifically provided for under applicable provisions of internal revenue laws.* Treas. Reg. (26 C.F.R.) § 1.1011–1 (emphasis supplied). The Fresh Start Basis Rule is an applicable provision of the internal revenue laws "otherwise specifically" providing rules for determining a gain or loss. Accordingly, the Fresh Start Basis Rule applies for purposes of determining any loss that is otherwise claimable under Section 165 in respect of any asset held by Trigon on January 1, 1987.

Regulations further establish when the taxpayer is entitled to claim a loss under Section 165:

> A loss shall be allowed as a deduction under Section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.

Treas. Reg. § 1.165–1(d)(1). The regulations provide a deduction for:

> A *loss* incurred in a *business* or in a transaction entered into for profit and arising from the *sudden termination* of the usefulness in such business or transaction *of* any *nondepreciable property,* in a case *where such* business or *transaction is discontinued or* where such *property* is *permanently discarded* from use therein, *shall be allowed* as a *deduction* under Section 165(a) for the *taxable year in which the loss is actually sustained.*

Treas. Reg. § 1.165–2(a) (emphasis supplied).

It is this kind of loss that is at issue in this action. In order for such a loss to be deductible, it must be evidenced by a closed and completed transaction, fixed by an identifiable event, and sustained during the taxable year for which the loss is claimed. 26 C.F.R. § 1.165–1(b), (d). As the Sixth Circuit recently held, the identifiable event "must be observable to outsiders and constitute 'some step which irrevocably cuts ties to the asset.'" *United Dairy Farmers, Inc. v. United States,* 267 F.3d 510, 522 (6th Cir.2001) (quoting *Corra Resources, Ltd. v. Commissioner,* 945 F.2d 224, 226–27 (7th Cir.1991)).

The applicable regulation does not use the terms "cancellation," "termination" or "abandonment" to describe the kind of loss for which a deduction is permitted. Rather, the regulation permits deductions of two sorts. First, there is a deduction for

> a loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued.

Second, it permits a deduction "where such property is permanently discarded from use [in the business or transaction]." Treas. Reg. § 1.165–2(a). The loss at

issue here occurred by way of contract termination, not by permanently discarding of the contracts by Trigon. Thus, it is a loss of the type described in the first clause of the regulation.

 Trigon correctly argues that the cancellation or termination of a subscriber or provider contract is evidence of a closed and completed transaction and is an identifiable event within the meaning of Section 1.165–1(d)(1) of the regulations. Moreover, the cancellation or termination of a contract results in the sudden termination of its usefulness in Trigon's business and, therefore, satisfies the requirements for deductibility described in Section 1.165–2(a) of the Regulations.

Courts have recognized that the termination of a contract may result in a taxable loss under Section 165. *See, e.g., George Freitas Dairy, Inc. v. United States,* 582 F.2d 500 (9th Cir.1978) (where private quota system was abandoned and quotas became worthless, taxpaying dairies sustained losses deductible under 165.); *Super Food,* 416 F.2d at 1236 (taxpayer, which sold supplies to franchised grocers, would be entitled to loss deduction under 165 for termination of franchise contracts on showing of cost of contracts.); *Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 608 F.2d 485 (Cl.Ct.1979) (where television station bought by taxpayer had dual network affiliation at time of taxpayer's purchase, the loss suffered by taxpayer upon termination of affiliation with one of the networks was a recognizable loss under 165(a), and taxpayer's deduction for such loss was not barred as a result of the additional network revenues it received under its exclusive affiliation with the other network.); *see also Metro Pictures Film Exchange,* 1 B.T.A. 721, 1925 WL 769 (1925) (loss on termination of contract for distribution of motion pictures).

In *Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1241 (7th Cir.1969), the taxpayer sought to deduct, under 26 U.S.C. § 165(a), the losses it suffered from its termination of franchise contracts it had previously purchased from a third-party. The court, in allowing the deduction there at issue, relied on Treas. Reg. § 1.165–2, the same regulation on which Trigon relies. *Super Food* is in many ways similar to this case because in both cases, the contracts were terminated and valueless upon that termination, such termination having a specific date, the year of which the plaintiffs in both cases had to claim the deduction. Thus, *Super Food* provides an example of reasoning that allows Trigon to take loss deductions under Treas. Reg. § 1.165–2.

In its Post–Trial Memorandum, the United States purports to rely on the position on this issue asserted in its pretrial Proposed Findings of Facts and Conclusions of Law and adds two other terse arguments. Each will be considered in turn, but, before turning to that task, it is appropriate to take a brief detour to explain terminology that permeates those arguments.

In the vernacular of the tax lawyers' world, the kind of loss at issue here is sometimes referred to as an "abandonment loss." Abandonment is an act taken by the taxpayer and is the type of loss that is permitted, under the second sentence of Treas. Reg. § 1.165–2(a), when the taxpayer permanently discards an asset from use in its business.

The arguments of the United States, and, to some extent, Trigon, do not differentiate between the two different events, cancellation or termination on the one hand, or permanently discarding or abandonment on the other. Nor do many of the decisions. The distinction between the kinds of events which give rise to the loss

that is deductible is not of great significance in disposing of the arguments made by the United States, but it does somewhat becloud the real issue, which focuses on cancelled or terminated contracts, not on assets discarded by Trigon.

First, the United States seems to disagree that there were tax deductible abandonments, a position it does not support by further argument or any authority. By this, the United States seems to mean that the contract terminations are not abandonments because, immediately after a contract was terminated, Trigon undertook efforts (some successful, most not) to enter into new contracts with the terminating subscriber or provider.[11]

■ To qualify for the deduction when there is an abandonment, the taxpayer must show its intent to abandon the underlying asset. In *Gulf Oil Corp. v. Commissioner,* 914 F.2d 396, 402 (3d Cir.1990), the Third Circuit noted that "I.R.C. § 165 losses have been referred to as abandonment losses to reflect that some act is required that evidences an intent to discard or discontinue use permanently." *See also Kraft, Inc. v. United States,* 30 Fed. Cl. 739, 785 (1994) ("Abandonment of an asset in tax law is defined as a permanent disposition, not sold, never to be used again and not retrieved for sale, exchange, or other disposition . . . ."); *CRST, Inc. v. Commissioner,* 909 F.2d 1146, 1148 (8th Cir.1990) ("Section 165 requires both an intent to abandon the asset and an affirmative act of abandonment"); *A.J. Industries, Inc. v. United States,* 503 F.2d 660, 670 (9th Cir.1974) ("It has been repeatedly held that in order for a loss of an intangible asset to be sustained and to be deductible, there must be (1) an intention on the part of the owner to abandon the asset,

and (2) an affirmative act of abandonment").

It is clear that Trigon systematically pursued contractual relationships with those who cancelled or terminated their subscriber or provider contracts and that Trigon continued to hope that the lost subscriber or provider would enter into a new contract. The record shows, for instance, that, when a subscriber group cancelled its Trigon coverage, the fact of the cancellation, as well as the reason for the cancellation and other pertinent information, was logged into the group's account profile, which, in turn, was fed into the company's group subscriber accounting system for use by the head of sales and other executives. Slone Tr. (11/13/01) 296:20–297:6, 302:22–304:1; Cothran Tr. (11/12/01) 267:2–269:24. A cancelled group would also immediately go into the sales department's prospect database along with other businesses that had never had Trigon coverage. Slone Tr. (11/12/01) 297:7–19. Beyond question, Trigon wanted to secure new contracts with terminating subscribers and Trigon systematically pursued that objective.

However, there was no way for Trigon to know if, or when, a cancelled group would ever decide to buy another Trigon contract. Slone Tr. (11/13/01) 298:11–14; Davis Tr. (11/12/01) 167:12–168:15. Indeed, as one might expect, it generally was more difficult to convince a group that had terminated its contract with Trigon to buy a new contract than it was to convince a group that had never had Trigon coverage to purchase coverage for the first time. Convincing a cancelled group to buy a new contract was an "uphill battle." Davis Tr. (11/12/01) 167:24–168:15.

---

**11.** This interpretation of the argument made by the United States is gleaned from statements made by counsel in addressing certain evidentiary objections, from certain lines of questioning, and from closing arguments.

These undisputed facts, says the United States, establish that Trigon did not abandon the contracts for which it seeks the abandonment loss. To support this position, the United States relies principally on *United Dairy Farmers, Inc. v. United States*, 107 F.Supp.2d 937 (S.D.Ohio 2000), *aff'd*, 267 F.3d 510 (6th Cir.2001), and cites that decision as determinative of whether Trigon abandoned the assets at issue here. In *United Dairy Farmers*, the taxpayer commissioned, between 1986 and 1992, engineering studies relating to various potential changes in an existing ice cream making facility. It deducted the costs for all of those studies in 1993, when it decided to construct another facility, claiming that construction of the other facility was the identifiable event evidencing abandonment of the studies; however, the taxpayer retained the facility to which the studies related. The district court denied the deduction, finding that the taxpayer had not truly abandoned the studies:

> The Court cannot square UDF's position that the Erlanger project caused it to decide not to invest further in the Norwood plant when it commissioned a new [engineering] study soon after claiming the Erlanger project caused it to abandon the first [engineering] study. This action tends to show that UDF's concept of whether a project has been abandoned is transitory in nature.

*United Dairy Farmers, Inc. v. United States*, 107 F.Supp.2d 937, 946 (S.D.Ohio 2000). The district court held that the decision to construct the new facility was "not the 'identifiable event' which rendered the other studies worthless" and concluded that the taxpayer had not met its burden of showing that there was an identifiable event in 1993 that fixed the loss. *Id.*, 107 F.Supp.2d at 945. The Court of Appeals affirmed the denial of the deductions on October 3, 2001, shortly after the parties submitted their pretrial briefs in this matter. *United Dairy Farmers, Inc. v. United States*, 267 F.3d at 523.

Without doubt, Trigon systematically continued to pursue the re-establishment of relations with many of its subscribers and providers after they terminated their contracts; however, in contrast to the *United Dairy Farmers* decision, the termination or cancellation of a subscriber or provider contract was an identifiable event that completely changed the legal relationship between Trigon and the terminating subscriber or provider. Unlike the taxpayer in *United Dairy Farmers*, which retained the unilateral right to determine whether it would subsequently implement a study that it claimed to have abandoned, Trigon's ability to obtain a new contract with a terminated group depended on decisions to be made by an unrelated party. Any new contract between Trigon and the group or provider, if such a contract should ever come into existence, would become an asset separate and distinct from the terminated contract.

The ultimate termination or cancellation of the contract by the subscriber, provider or by Trigon represented the identifiable conclusion of the asset because the contract ended and there was no future income stream. The contracts at issue typically were year to year contracts the terms of which were renewed each year until there was a failure to renew or there was some other termination. Though year to year, the contracts, from a practical and realistic perspective, had an average life and an average value that could be ascertained given the conglomerated experience of a larger group of similar contracts. The end of that contract life is easily identifiable. If a subscriber or provider who had terminated or cancelled his contract with Trigon, again became a subscriber or provider of Trigon, a new

contract would be entered into, and a new contract life would begin.

██ Finally, the Fourth Circuit has made clear that worthlessness is an appropriate basis for an abandonment loss under Section 165. *Helvering v. Gordon*, 134 F.2d 685, 687 (4th Cir.1943) ("[I]n the case of personal property, such as securities, actual worthlessness is the test irrespective of retention of title since practical rather than technical considerations should prevail."); *see also Echols v. Commissioner*, 935 F.2d 703, 707 (5th Cir.1991) ("As a general proposition, a taxpayer may claim a loss deduction under I.R.C. § 165(a) of the Code on either of two alternative grounds: abandonment or worthlessness."). The termination of a contract rendered it worthless.

For the foregoing reasons, the fact that Trigon attempted to enter into new contracts with terminated subscribers or providers does not foreclose deduction of a loss for the terminated contract under Section 165 and its implementing rule. Treas. Reg. § 1.165–2(a). That is true whether the loss is considered as a cancellation/termination or an abandonment.

Second, the United States argues that, even if the claimed loss is appropriate in general, Trigon is not entitled to take the deduction until after the termination of all contracts owned as of January 1, 1987.[12] The argument is this: (1) individual contracts cannot be reliably valued and there is no market for individual contracts; (2) contracts can only be reliably valued, and only are sold, as blocks; (3) therefore, the asset is the block; and (4) an abandonment loss is not permitted for part of an asset; *i.e.*, the contracts terminated in the taxable years for which the loss is claimed.

The point is perhaps well-taken, if the asset is defined as a block of contracts, but the Court previously has found that each subscriber and provider contract is a clearly identifiable and severable asset. *See* Section A.1, *supra.* Hence, the argument is foreclosed for failure of its premise.

## C. The Absence Of A Secondary Market For Single Contracts Does Not Preclude Application Of The Fair Market Value Standard

Yet another threshold contention in this case is that the absence of an active market in which individual subscriber and provider contracts are traded prevents those contracts from being valued under a fair market value standard.

It is an undisputed fact that there are no known sales of single group health insurance contracts between insurance carriers either before January 1, 1987, or after. Davis Tr. (11/12/01) 190:24–191:5; Cothran Tr. (11/12/01) 256:4–10; Snead Tr. (11/19/01) 1416:25–1417–5; Byrd Tr. (11/16/01) 1157:11–22; Pugh Tr. (11/15/01) 1046:24–1048:8. Transactions involving large blocks of health insurance contracts have occurred. Davis Tr. (11/12/01) 191:6–9.

An expert for the United States, Michael D. Pugh, testified that transactions in blocks of contracts generally occur with the sale of entire companies or when companies leave a market and sell all of their contracts in a given geographic region. Pugh Tr. (11/15/01) 1083:25–1084:13. But, the record is that, in large block transactions, neither party attempts to calculate a purchase price based on the purported value of individual contracts. Davis Tr. (11/12/01) 192:2–7; Cothran Tr. (11/12/01) 256:4–10; Snead Tr. (11/19/01) 1416:25–1417:8 and 1417:16–1418:6; Byrd Tr. (11/16/01) 1157:11–22; and Cellucci Tr. (11/19/01) 1184:3–17. Instead, the purchase price is based on the value of the

12. United States' Post–Trial Brief, pp. 25–26.

entire block of contracts. Snead Tr. (11/19/01) 1418:17–1419:17; Byrd Tr. (11/16/01) 1158:8–1160:9. Trigon's own valuation expert, Wierwille, testified that buyers of large blocks of health insurance contracts do not value individual contracts when determining a purchase price. Wierwille Tr. (11/14/01) 628:9–20. After a transaction has closed, a purchaser occasionally will retain an appraiser to allocate the purchase price previously negotiated among the various assets that were acquired. Wierwille Tr. (11/14/01) 628:21–629:9.

When considering blocks of contracts, potential purchasers evaluate the profitability of the contracts under their own management, not the seller's management. Byrd Tr. (11/16/01) 1161:21–1162:5. Moreover, as even Trigon's executives recognize, different insurers will have different experiences even with the same blocks of contracts. Davis Tr. (11/12/01) 195:10–13. Trigon has acquired at least two blocks of health insurance contracts for which it paid little or no consideration. Meyer Tr. (11/16/01) 1122:9–13. When the Life of Virginia company and a company referred to in the record as "MAMSI" wanted to leave the health insurance business, Trigon assumed their contracts at no cost. Meyer Tr. (11/16/01) 1122:14–1123–18.

The United States asserts that the term "fair market value" by its express terms requires, as a predicate, that an asset can, in fact, be bought and sold in commercial transactions. In *Transamerica Corp. v. United States*, 15 Cl.Ct. 420, 474–75 (1988), the court held that:

> The term "fair market value" in the regulations does not apply to property in which the values cannot be identified with actual commercial market activity. . . . Where no one is willing to pay anything for property, its fair market value is zero.

Similarly, in *Griffin v. United States*, 935 F.Supp. 1 (D.D.C.1995), the estate of former President Richard M. Nixon was seeking compensation for the taking of his presidential papers. Under the applicable statute, compensation was set in terms of fair market value. While the court found that the estate was entitled to compensation for many of the records, it found that the estate was not entitled to compensation for documents the President could not legally transfer because they had no fair market value. In this regard, the court held:

> The measure of any compensation due attaches as of the date of the taking. Here, the taking occurred on the day the [Presidential Recordings and Materials Preservation Act] became effective. At that time, the national security materials were classified and subject to executive orders which would not allow a President to transfer ownership of them to a member of the public without violating the law. In fact, *plaintiffs, through their motion for partial summary judgment granting declaratory relief, concede that compensation should be measured pursuant to the fair market value at the time of the taking.*
>
> . . . . Accordingly, plaintiffs are not entitled to compensation for these materials . . . .

*Id.,* 935 F.Supp. at 9–10 (emphasis supplied).

In the context of stock options, the IRS has long taken the position, sustained by the courts, that such options do not have a readily ascertainable fair market value unless they can legally be transferred. Treas. Reg. 1.83–7(b)(2); 26 C.F.R. § 1.83–7(b)(2) provides in pertinent part:

> When an option is not actively traded on an established market, it does not have a readily ascertainable fair market value unless its fair market value can other-

wise be measured with reasonable accuracy. For purposes of this section, if an option is not actively traded on an established market, the option does not have a readily ascertainable fair market value when granted unless the taxpayer can show that all of the following conditions exist:

 i. The option is transferable by the optionee; ....

See also *Pagel, Inc. v. Commissioner,* 905 F.2d 1190, 1191 (8th Cir.1990) ("If an option received as compensation is not publicly traded and the optionee is restricted from immediately exercising or disposing of the option, the option has no readily ascertainable fair market value").

The United States argues that, in this action, there is no evidence that any sale of a single health insurance contract has ever taken place. And, that is true. Moreover, many of the witnesses in this case, including Trigon's valuation expert in its case-in-chief, Michael Wierwille, and its rebuttal expert, Robert F. Reilly, acknowledged that it was unlikely, for a variety of economic reasons, that any such sale could ever take place.

Trigon's expert appraiser testified that, although nobody would buy single health insurance contracts, those amounts set as their fair market value were still the prices at which the contracts would change hands in a hypothetical transaction for purposes of defining fair market value. Wierwille Tr. (11/14/01) 611:8–11. By contrast, Trigon's rebuttal expert testified as follows:

Q. As an appraiser would you sign an opinion putting a fair market value on a single contract separate and apart from its block and represent that [it] was the price at which that one contract would change hands?

A. No, because that would not be fair market value. In a fair market value transaction one contract would not change hands.

Reilly Tr. (11/20/01) 1591:21–1592:3.

Trigon contends that the argument made by the United States is based on a misconstruction of Reilly's testimony, which makes it clear that the determination of fair market value—for individual contracts—requires an assessment of the "commercially reasonable level of trade" for a particular asset. Reilly Tr. (11/20/01) 1592:8–1593:19. This does not mean, however, that because insurance contracts typically trade in blocks, therefore individual contracts do not have fair market value. Reilly Tr. (11/20/01) 1527:12–18. Rather, the "level of trade" merely identifies the methodology used by the valuation expert in applying the willing buyer/willing seller standard. Reilly Tr. (11/20/01) 1588:22–1589:2 (level of trade determines source of valuation data).

■■. Wierwille's individual fair market value determinations are based on an assumption that each subscriber and provider contract would be sold as part of a "going concern" that includes other contracts and assets. Wierwille Tr. (11/14/01) 754:7–25. In similar contexts, courts have recognized that "when a business is sold as a package, its assets must be valued in that posture." *Fedders Corp. v. Commissioner,* 39 T.C.M. (CCH) 1, 19, 1979 WL 3408 (1979), *aff'd without pub. opinion,* 659 F.2d 1066 (3d Cir.1981); *see also Kraft Foods Co. v. Commissioner,* 21 T.C. 513, 585, 1954 WL 382 (1954), *rev'd on other grounds,* 232 F.2d 118 (2d Cir.1956). Thus, Trigon's subscriber and provider contracts must be valued on the theory that they would be sold to a hypothetical willing buyer having facilities comparable to those of the seller. *Knapp King–Size Corp. v. United States,* 208 Ct.Cl. 533, 527 F.2d 1392, 1401–02 (1975). Attempting to value the contracts on a stand-alone basis

(which the government appears to advocate), rather than as part of a going concern, results in an improper determination of "liquidation value," rather than fair market value. *Fedders*, 39 T.C.M. (CCH) at 19; *see also* Reilly Tr. (11/20/01) 1589:10–24 (failure to view contracts at appropriate level of trade results in liquidation value); Wierwille Tr. (11/14/01) 761:19–762:11 (failure to apply premise of highest and best use results in a determination of liquidation value). Valuing the contracts "in use" as Wierwille did is consistent with a determination of fair market value for each contract. Wierwille Tr. (11/14/01) 755:1–16; *see also* Defense Exh. 16 at TR01150006–07 (fair market value of an asset "in continued use . . . presupposes the continued use of the asset in connection with all other assets"). "The decisive consideration is not the lack of an established trading market but the lack of any reasonable factual basis from which to determine the probable sum that fair negotiations between a hypothetical buyer and seller would produce." *Campbell v. United States*, 228 Ct.Cl. 661, 661 F.2d 209, 215 (1981).

The United States responds that "highest and best use" is a concept that is applied almost exclusively to the valuation of real estate.[13] Typical cases involve issues such as whether real estate should be valued based on a commercial use or a non-commercial use. *See, e.g., United States v. Banisadr Building Joint Venture*, 65 F.3d 374 (4th Cir.1995) (determining whether an office building should be valued as regular office space or as a specialized "high tech" building). Here, the issue is not whether the highest and best use of Trigon's contracts is as part of an ongoing health insurance company. Indeed, that is the only use of the contracts. The issue, instead, is whether specific contracts can be valued separately from the block of contracts to which they belong.

 In making this "no market, no value" argument, the United States disregards the authorities relied on by Trigon, which hold that the absence of a market for an asset does not preclude it from having a fair market value for federal tax purposes. The case law establishes that the willing buyer/willing seller standard governs the determination of the fair market value of an asset even if there is no established market for the asset and even if the particular asset cannot in fact be sold. *See, e.g., Guggenheim v. Rasquin*, 312 U.S. 254, 258, 61 S.Ct. 507, 85 L.Ed. 813 (1941) ("[T]he absence of market price is no barrier to valuation."); *Bank of California, N.A. v. Commissioner*, 133 F.2d 428, 433 (9th Cir.1943) (Even if property "was not assignable, it still could have a fair market value."). *see also Shackleford v. United States*, 262 F.3d 1028, 1033 (9th Cir.2001) ("Where a willing seller and will-

---

**13.** The United States conducted a Westlaw search seeking all Fourth Circuit decisions containing the term "highest and best use." It found twenty-two decisions, each one of which dealt with valuing real estate. In *Jack Daniel Distillery v. United States*, 180 Ct.Cl. 308, 379 F.2d 569 (1967), cited by Trigon, the plaintiff acquired the stock of a predecessor corporation by the same name. One of the issues, for purposes of assigning basis, was the value of the prior corporation's Jack Daniels whiskey that had not yet reached bottling age. The Government argued that the value of the Jack Daniels label was separate and distinct from the whiskey itself, and should not be included in the whiskey's basis. The court rejected the Government's argument, holding that, "[t]he fair market value test is predicated in part on the highest and best use which can be made of the subject matter, and the evidence certainly shows that the Jack Daniel whiskey would in 1956 have sold at the highest price under its own labels." 379 F.2d at 576. This holding clearly does not stand for the proposition that the value of an asset can be divided among its non-marketable component parts. Thus, it is irrelevant to Trigon's claims.

ing buyer do not exist, we will presume both their presence and a hypothetical sale."); *Collins v. Commissioner*, 216 F.2d 519, 523 (1st Cir.1954) ("Where there is no market price because the property is not transferable, the Tax Court has to take into account all relevant facts and elements of value."). Courts routinely have determined the fair market value of contingent claims, rights to contingency fees and similar interests held by decedents regardless of the absence of an established market for such assets. *See Estate of Curry v. Commissioner*, 74 T.C. 540, 551, 1980 WL 4454 (1980); *see also* Rev. Rul. 58-402, 1958-2 C.B. 15, 1958 WL 10389 ("There are many cases in which contracts to receive indefinite amounts of income have been valued for tax purposes."). As one court has explained:

> Fair market value is a term and a measure long used in the law as applicable to property having no actual current market place ..., and this statute uses the term thus broadly .... Where the property is of a class ... which has established markets where there are daily dealings, the "fair market value" is more easily and more accurately ascertainable, but the difference between such class and others is not that of the existence vel non of a "fair market value" but is solely one of the character and extent of proof.

*Whitlow v. Commissioner*, 82 F.2d 569, 572 (8th Cir.1936) (citations omitted). In *Estate of Smith v. Commissioner*, 28 T.C.M. (CCH) 127 (1969), *aff'd*, 420 F.2d 1385 (4th Cir.1970), the Tax Court determined the fair market value of a reversionary interest in property for estate tax purposes, noting that because there was no market in which remainder or reversionary interests were regularly bought and sold, "the fair market value to be determined in this case is a hypothetical fair market value which is equivalent to 'intrin-

sic or actual value.'" 28 T.C.M. (CCH) at 133 (citations omitted).

Similarly, the fact that there is not an established market for an asset in a particular quantity or volume does not preclude application of the fair market value standard. *See Jack Daniel*, 379 F.2d at 578 (fair market value of unbottled inventory of whiskey should be determined by expert testimony; although there had been no bulk sales, "it does not follow that the 'fair market value' standard can be disregarded ....").

Even the Treasury Regulations establish that "only in rare and extraordinary cases will property be considered to have no fair market value." Treas. Reg. § 1.1001–1(a). In the case of intangible assets such as the subscriber contracts at issue in this case, the IRS itself has taken the position that, in the absence of an established market, "fair market value" of the intangible assets of a business generally is determined by capitalizing the income of the business, subtracting the fair market of the tangible assets, and allocating the rest to the intangible assets. Rev. Rul. 68-609, 1968-2 C.B. 327, 1968 WL 15211.

Trigon argues that, like every other insurance company, Trigon sells insurance contracts to subscriber groups one contract at a time. *See* Slone Tr. (11/13/01) 287:3–20. While the United States does not challenge this fact, it nonetheless maintains that, because there is no established secondary market in which to measure the value of each contract, a determination of fair market value cannot be made. The United States' position is contradicted by the testimony of Trigon's valuation experts, both of whom confirmed that the absence of a secondary market for Trigon's contracts does not preclude a determination of their fair market value. Wierwille Tr. (11/14/01) 593:16–23; Reilly Tr. (11/20/01) 1533:17–25, 1563:25–1564:23.

The United States' own valuation methodology expert does not subscribe to its position. *See* Foster Tr. (11/16/01) 1268:16–21 ("There are circumstances where you are presuming there are some willing buyers and willing sellers.").

For the foregoing reasons, the Court finds that, as the testimony of Wierwille, Reilly and Foster confirms, fair market value assessments can be made without the existence of a market.

## D. Individual Subscriber Contracts Can Have A Fairly Ascertainable Value

The final preliminary issue that must be broached before addressing with the valuation case offered by Trigon is the contention of the United States that the income stream earned from the individual health insurance contracts at issue in this case cannot be determined with fair certainty, and therefore cannot have an ascertainable fair market value. In reliance on *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), and its progeny, the United States contends that, because of the need to "pool" the risk inherent in health insurance contracts, to spread risk among a group of insureds, it is impossible to determine reliably the cash flow from individual contracts. Health insurers expect to use profitable contracts to subsidize unprofitable ones. But, the insurer does not know in advance which contracts will be profitable and which will not. According to the United States, none of these results can be accurately predicted for individual contracts. They can only be predicted reliably when contracts are aggregated into large blocks; and, therefore, says the United States, tax deductions cannot be allowed for the loss of particular contracts.

In *Burnet v. Logan*, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), the decision on which this argument is predicated, the Supreme Court held that a contract did not have an ascertainable fair market value unless the income from the contract could be determined with "fair certainty." *Id.*, 283 U.S. at 412, 51 S.Ct. 550. In *Logan*, the taxpayer owned stock in a steel company that, in turn, owned a minority interest in a mining company. 283 U.S. at 409–10, 51 S.Ct. 550. In 1916, she sold her stock to Youngstown Sheet & Tube Company ("Youngstown") and received cash plus a contractual right to 60 cents per ton of iron ore received by Youngstown in the future from the mining company. *Id.* There was no requirement, however, that the mining company extract any particular amount of ore. *Id.*, 283 U.S. at 409, 51 S.Ct. 550. The taxpayer reported the sale using the open transaction method, arguing that she was entitled to recover her basis in the shares she had originally owned before having to report any income from the transaction. *Id.*, 283 U.S. at 410–11, 51 S.Ct. 550. The IRS asserted that the transaction should be treated as closed in 1916 and the taxpayer's gain determined by reference to the fair market value of the Youngstown obligations in that year. The Supreme Court agreed with the taxpayer. According to the Court, Youngstown's promise to make future payments based on the ore mined by the mining company had "no ascertainable fair market value" and the taxpayer might never recover her basis "from payments only conditionally promised." *Id.*, 283 U.S. at 413, 51 S.Ct. 550. Under such circumstances, the Supreme Court concluded that keeping the transaction open would ensure that the taxpayer ultimately paid tax on the correct amount of gain, holding that:

> future money payments [under the contract were] wholly contingent on facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense

equivalent to cash. It had no ascertainable fair market value.

*Id.*, 283 U.S. at 413, 51 S.Ct. 550.

The circuit court, whose analysis was approved by the Supreme Court, had cited the following reasons as to why the fair market value of the contract could not be ascertained:

> There were many uncertainties involved in the future receipt of 60 cents a ton by this petitioner. She, a minority stockholder, was not in control. The right to continue to receive ore was dependent on the continuance in force of the contract of December 16, 1914, between the stockholders of the Mahoning Company. That contract might be abrogated or changed. No maximum or minimum payment is provided for by the contract. The tonnage mined each year was subject to the discretion of the board of directors of the Mahoning Company. The ore mined each year in the future might not come up to the production estimated as necessary to exhaust the mine in 45 years.

*Logan v. Commissioner*, 42 F.2d 193, 195 (2d Cir.1930).

The United States' reliance on *Logan* is misplaced. As Trigon correctly notes, the United States ignores a critical fact in *Logan* that distinguished it from the facts of this case. Specifically, in *Logan*, the taxpayer's mother had owned stock in the same company, which she sold to Youngstown in 1916 for the same package of consideration. In 1917, the taxpayer's mother died, and the taxpayer inherited one-half of her mother's right to receive contingent payments from Youngstown. That bequest was valued at $277,165 for federal estate tax purposes, and that value was used to determine the taxpayer's basis in the contingent payment obligations inherited from her mother. *Id.*, 283 U.S. at 410, 51 S.Ct. 550. Thus, the facts of *Logan* make it clear that, when it is neces-

sary to determine the fair market value of the contingent obligation, it was possible to do so. The Court explained the distinction between open transaction treatment for the proceeds and the determination of fair market value for other purposes, including basis:

> We are not dealing with royalties or deductions from gross income because of depletion of mining property. *Nor does the situation demand that an effort be made to place according to the best available data some approximate value upon the contract for future payments.* This probably was necessary in order to assess the mother's estate.

283 U.S. at 412, 51 S.Ct. 550 (emphasis supplied).

Subsequent decisions have also recognized this distinction. In *Dorsey v. Commissioner*, 49 T.C. 606, 1968 WL 1406 (1968), the Tax Court recognized that *Logan* does not apply to "cases which involve March 1, 1913, values or estate tax valuations where the problem was such that there had to be an immediate determination of value without awaiting future experience." 49 T.C. at 632 (citations omitted). *Id.* As Trigon correctly assets, Section 1012(c)(3)(A)(ii) of the 1986 Act requires that Trigon determine its basis in each asset held on January 1, 1987, by reference to its fair market value on that date and that "an immediate determination of value" be made. *See* Tax Reform Act of 1986, § 1012(c)(3)(A)(ii). Thus, because of the Fresh Start Basis Rule, "the situation demand[s] that an effort be made to place according to the best available data some approximate value upon the contract[s]." *Logan*, 283 U.S. at 412, 51 S.Ct. 550. In this respect, this case is indistinguishable from cases that determined the fair market value of an asset owned on March 1,

1913, in order to fix the taxpayer's tax basis in the asset.

The fact that the income stream from a particular subscriber contract might be difficult to predict does not prevent a professional appraiser from determining fair market value. Trigon provided expert testimony from two appraisers, Wierwille and Reilly, each of whom has more than 20 years of experience valuing intangible assets. Both testified that the fair market value of separate group health insurance contracts can be determined. Wierwille Tr. (11/14/01) 755:10–16; Reilly Tr. (11/20/01) 1527:12–1528:18. Their testimony, which was not contradicted on this point by any of the government's experts, satisfies the applicable "best estimate which the circumstances allow" standard.

This is particularly true when an entire segment of industry is ordered by an act of Congress to ascertain the value of all assets as of a specific date. Even if the United States' argument that a deduction could only be claimed upon the termination of the entire block of contracts were taken for legal truth, at the point of termination, a value would have had to have been associated with the deduction, and, under the 1986 Act, the value of the contracts, and thus the value of any potential deduction, must be determined under the appropriate statute, as of January 1, 1987.

### E. Description Of The Wierwille Report: Valuation Of Trigon's Subscriber And Provider Contracts

Having disposed of the several issues which, according to the United States, stand in the way of any valuation of Trigon's contractual assets, it is time now to turn to the actual asset valuation which is the predicate for Trigon's refund claim.

Valuation of the assets here at issue was first accomplished in 1988 by Arthur Andersen and that valuation was, to some extent, used as the basis for Trigon's initial refund claim to the IRS. Also, Trigon used the Arthur Anderson valuation during its negotiations with the IRS. Once this action was filed, however, Trigon abandoned reliance on the Arthur Andersen valuation and, instead, identified Wierwille as the person whose valuation would be the basis of its refund claim.[14]

Trigon's valuation case at trial was presented through the testimony of Wierwille, who purported to value each specific health insurance contract that Trigon possessed on January 1, 1987, using the fair market value standard specified by § 1012(c)(3)(A)(ii) of the 1986 Act.[15] Wierwille Tr. (11/13/01) 481:7–16 and 482:6–9. Wierwille reviewed lists of, and information about, contracts owned by Trigon on that date and designated for each contract an amount that he claimed was its fair market value. Plaintiff's Exh. 282 and Plaintiff's Exh. 282A;[16] Wierwille (11/13/01) 480:2–11.

---

**14.** Wierwille is an expert in the valuation of intangible assets, and has been in the business of making fair market value determinations since 1973. Before September 1, 2001, Wierwille was a principal in the Corporate Value Consulting business of PricewaterhouseCoopers ("PwC"). That business is now part of Standard & Poor's.

**15.** The definition of fair market value used by Wierwille was "[t]he price at which the property would change hands between a willing buyer and a willing seller, neither being un-

der any compulsion to buy or sell and both having reasonable knowledge of the facts." Defense Dem. Exh. 1; Wierwille Tr. (11/14/01) 603:6–11. The United States agrees with that definition.

**16.** Plaintiff's Exhibit 282 contains Wierwille's original conclusions of value. Later, he corrected his valuation conclusions, reducing the values by three to seven percent. Wierwille Tr. (11/14/01) 566:13–568:6. The modified values are set forth in Plaintiff's Exhibit 282A.

On October 30, 2000, Wierwille issued a report detailing his methodology for arriving at the fair market value of the subscriber and provider contracts that Trigon owned on January 1, 1987. Plaintiff's Exh. 103. Wierwille opines that the subscriber and provider contracts were separate and distinct assets that can be valued using accepted valuation methodologies, in this case the "income approach" for the subscriber contracts and the "cost approach" for the provider contracts. At trial, Wierwille stated his opinion on valuation and explained the basis for it and the methodology used to arrive at it. As part of the predicate for Wierwille's opinion, Trigon offered testimony from current and former Trigon management and other evidence.

### 1. Valuation Of The Subscriber Contracts (Method And Value)

In valuing Trigon's subscriber contracts under the fair market value standard, Wierwille considered three generally accepted valuation methodologies: the market approach, the cost approach, and the income approach. Wierwille Tr. (11/13/01) 483:3–24. He rejected the market approach because he found no appropriate market comparables, and he rejected the cost approach as irrelevant to a determination of fair market value for income-producing assets. Wierwille Tr. (11/13/01) 483:3–24. Therefore, Wierwille determined the fair market value of Trigon's subscriber contracts using an "income approach" and the discounted cash flow methodology. Wierwille Tr. (11/13/01) 482:20–24.

To determine the fair market value of Trigon's contractual relationships with its subscribers, Wierwille applied the income approach by projecting the remaining anticipated useful life of each contract determined as of January 1, 1987, the valuation date, and then ascertaining the anticipated future profits of the subscriber contracts over the projected remaining life. He

then discounted that total sum to the value as of January 1, 1987.

■ The income approach has been utilized by other valuation professionals to determine the fair market value of assets similar to those at issue here. Use of the income approach to determine the fair market value of the subscriber contracts is consistent with how courts have applied the fair market value standard to other customer-based intangible assets. *See, e.g., Newark Morning Ledger,* 507 U.S. at 546, 113 S.Ct. 1670; *Business Service Industries, Inc. v. Commissioner,* 51 T.C.M. (CCH) 539 (1986). It is also consistent with the official, published position of the IRS on the valuation of intangible assets for which there is no established market. *See* Rev. Rul. 68–609, 1968–2 C.B. 327, 1968 WL 15211.

■ The income approach, discounted cash flow method has three generally recognized components: (1) projection of asset life; (2) projection of the income or cash flow to be received from the asset over its life; and (3) discounting the future income or cash flow back to its net present value on the valuation date. *See, e.g.,* Wierwille Tr. (11/13/01) 487:5–14; *Newark Morning Ledger,* 507 U.S. at 546, 113 S.Ct. 1670; *Business Service Industries,* 51 T.C.M. (CCH) 539, 1986 WL 21488; Rev. Rul. 68–609, 1968–2 C.B. 327, 1968 WL 15211; Robert F. Reilly and Robert P. Schweihs, *Valuing Intangible Assets,* at 166 (1999). Wierwille applied these components in formulating his opinion as to the fair market value of each subscriber contract owned by Trigon on January 1, 1987.

### a. Asset Life Projections

Trigon's total enrollment of subscribers grew by more than two percent during the interplan competition. Feldstein Tr. (11/19/01) 1372:24–1373:24; Joint Exh. 2 at

TR01092306 ("[t]otal enrollment grew from 1982 to 1985 due to aggressive pricing strategies."). However, Trigon expected that, after the competition ended, enrollment in the traditional "Blue plan" would decline by approximately five percent per year for the three years immediately following the competition. Feldstein Tr. (11/19/01) 1372:24–1373:24; Joint Exh. 1 at TR01090829 ("[e]nrollment is expected to decline at an average rate of 5% per year to bring total enrollment from 919,300 contracts at the end of 1986 to 775,600 contracts at the end of 1989. The decline will result from aggressive price competition from traditional competitors as well as from new Alternative Delivery Systems and provider-competitors."). CHI also projected that its overall enrollment would reverse and begin to climb sometime after 1987, but that such growth would be in its HMO (Health Maintenance Organization) and TPA (Third Party Administrator). Joint Exh. 2 at TR01092302 ("[a]lternative Delivery Systems and Self–Insurance mechanisms will continue to erode the traditional base of Blue Cross Plans.") and TR01092306 ("[e]nrollment drops off in 1986 and 1987 due to the aggressive pricing of commercial carriers and start-up Alternative Delivery Systems. Enrollment achieves 1985 levels again in 1989 as our HMO and TPA products become major components of total enrollment."). The HMO and TPA products were offered by separate corporations that were not part of the Blue Cross Blue Shield plan. Cothran Tr. (11/12/01) 236:1–20.

The subscriber contracts typically were one year in duration, but were renewable. According to Trigon, it had a reasonable expectation that the contracts it owned on January 1, 1987, would renew, thereby generating income beyond their nominal one-year terms. *See* Hunt Tr. (11/13/01) 401:7–402:5; Byrd Tr. (11/14/01) 786:21–787:16. As a result, Wierwille concluded that, for valuation purposes, the subscriber contracts were subject to a statistical useful life (or "lifing") analysis. Wierwille Tr. (11/13/01) 505:2–4. That view is consistent with decisions in which the courts have recognized that, in valuing a contractual relationship, it is appropriate to determine the useful life of a contract by taking into account the likelihood of its renewal. *See, e.g., Union Bankers,* 64 T.C. at 807 (cancellable health insurance contracts estimated to have a useful life of seven years); *Super Food,* 416 F.2d at 1236 (retail franchise contracts terminable upon 30 days' notice found to have useful life of seven years); *Seaboard Finance,* 367 F.2d at 653 ("It is unnecessary that such a contract be limited to its duration on paper when taxpayer can demonstrate, as he did here, that the contract will be extended over a longer period of time.").

Under the income approach, the taxpayer's own experience in connection with contract terminations is the most reliable indicator of useful life. Trigon provided Wierwille with historical contract cancellation data for contracts that were cancelled or terminated during the 1984 through 1986 time period. Meyer Tr. (11/13/01) 354:13–17; Plaintiff's Exh. 68, 68–A. Wierwille used this data to develop a series of lifing curves specific to each of Trigon's lines of business and, within those lines of business, specific to the age of a particular subscriber contract. Wierwille Tr. (11/13/01) 492:11–510:24 (the lifing curves are set forth in Defense Exhibit 103 at TR46012316–325). The lifing curve determined for a line of business was then applied to each contract in that line owned by Trigon on the valuation date to predict the time period over which that contract could reasonably be expected to generate income. Wierwille Tr. (11/13/01) 493:23–494:4, 510:25–511:6.

### b. Cash Flow Projections

The projected cash flow component of the income approach, as applied by Wier-

wille, has two elements: (i) a projection of annual underwriting profit margins, and (ii) a projection of contract-specific premium income.

### (i) Profit Margin Projections

Trigon's underwriting department set the premiums for each contract. Perkins Tr. (11/20/01) 77:1–4; White Tr. (11/13/01) 325:20–326:10. In doing so, the underwriters relied on formulae developed by Trigon's actuarial department. White Tr. (11/13/01) 325:20–326:10. The premium formulae provided base rates in each line of business for the contract participants. Wood Tr. (11/15/01) 844:12–22.

To compute the formulae, Trigon's actuarial department set rates based on recent claims experience and projected trends in anticipated claims expense. Perkins Tr. (11/12/01) 66:16–71:15. To those costs, the actuaries added the cost expected for administrative expenses and sales commissions, as well as a profit "load." Perkins Tr. (11/12/01) 71:16–22 and 70:8–71:2.

The premium formulae were developed on a macro scale. Perkins Tr. (11/12/01) 69:14–25. The anticipated costs (both claims and administrative) and profits were calculated for an entire line of business. Perkins Tr. (11/12/01) 69:14–25; Hunt Tr. (11/13/01) 435:7–9; Wood Tr. (11/15/01) 862:8–23. For groups that were experience rated (and for cost-plus contracts), rates were based (to varying degrees) on the groups' claims experience. Perkins Tr. (11/12/01) 110:8–23. For community rated and small business groups, rates were based on tabular ratings that reflected group-specific demographics

(age, gender, location and industry of the group and its members). *See* Perkins Tr. (11/12/01) 105:22–108:10. Those rates also reflected charges for administrative expenses and a profit load. Perkins Tr. (11/12/01) 70:17–76:25. The goal of this pricing exercise was to achieve a profit on each subscriber contract. Perkins Tr. (11/12/01) 127:3–128:3.

However, once the underwriting department had set a price for a particular group, the sales department provided input regarding competitive factors. White Tr. (11/13/01) 338:16–25. Under normal competitive circumstances, there was a natural tension between the underwriting department and the sales department. White Tr. (11/13/01) 339:1–13. The underwriting department wanted to hold to the formula prices while the sales department wanted to reduce prices to get new business. White Tr. (11/13/01) 339:7–10.

Premium discounting was, and is, a standard practice in the health insurance industry. Phyllis Cothran, Trigon's Chief Financial Officer in 1986 and 1987, testified that premium discounts were a part of normal competition. Cothran Tr. (11/12/01) 241:3–5. Thomas Snead, Trigon's CFO subsequent to Cothran (and Trigon's current Chief Executive Officer) testified that premium discounts were allowed throughout his tenure as CFO. Snead Tr. (11/19/01) 1420:8–16.

Historically, the health insurance industry has experienced a consistently low underwriting profit margin.[17] Davis Tr. (11/12/01) 189:14–17; Cothran (11/12/01) 223:20–224:6. Trigon's underwriting profit

---

17. "Underwriting profit margin" refers to premiums minus claims and administrative expenses. Feldstein Tr. (11/19/01) 1347:1–8. Health insurance companies, including Trigon, rely on revenue from investments to supplement their overall profitability. The insurers invest the portion of their paid premiums not needed to cover current claims. The investment income bolsters the generally low underwriting profits. *See* Plaintiff's Exh. 34 at TR22330322 ("Investment income will continue to be the Plan's primary financial contributor"). "Underwriting profit margin" does not include investment income.

margin was no exception, having averaged less than one percent annually over the fifteen years from 1972 to 1986. Feldstein Tr. (11/19/01) 1347:22–1348:9; Wierwille Tr. (11/14/01) 699:10–13. Norwood Davis, Trigon's Chief Executive Officer and the Chairman of its Board of Directors on January 1, 1987, testified that the low profit margins resulted from the industry's evolution from a non-profit position and from the fact that, when commercial carriers began offering health insurance, they offered it as a loss leader for other insurance lines. Davis Tr. (11/12/01) 189:21–190:7.

Wierwille determined underwriting profit margins for each of Trigon's lines of business as of January 1, 1987, using a "benchmark" margin equal to the profit that would have been realized in 1986 but for the competition between the Richmond and Roanoke plans. Wierwille Tr. (11/14/01) 699:15–700:2. Wierwille projected this benchmark margin forward by using forecasts contained in two internal documents prepared contemporaneously to the valuation date. Wierwille Tr. (11/13/01) 526:4–12. The first was a memorandum dated August 25, 1987, which included three-year financial projections approved by Trigon's board on December 18, 1986. Plaintiff's Exh. 32 at TR01041118–1123. The second was a three-year Trigon financial forecast dated December 18, 1986. Joint Exh. 1. Using information about premiums, claims and administrative expenses from these documents, again adjusted to account for the Richmond–Roanoke competitive discounts, Wierwille projected line of business-level profit margins for the years 1987 through 1992. Wierwille's estimated profit margins ranged from 2.37 percent up to 4.97 percent for 1987 through 1992. The management of Trigon had forecast an underwriting loss of $4.9 million in 1987, and underwriting profits of $9.7 million and $43.8 million for

1988 and 1989 respectively. Plaintiff's Exh. 32 at TR01041123.

Wierwille determined that, by 1992, Trigon would achieve a stabilized "average" profit margin of 5.4 percent that could be carried forward for the balance of the 40–year valuation projection period. Wierwille Tr. (11/14/01) 697:4–9. Wierwille's annual profit margin projections, by line of business, are detailed in Defense Exh. 103 at pages TR46012290–91. *See also* Wierwille Tr. (11/14/01) 633:1–14.

### (ii) Premium Projections

Wierwille's premium projections are based on Trigon data files containing certain, but not complete, historical information about premiums, claims, administrative expenses and competitive discounts by line of business. Plaintiff's Exh. 66; Wierwille Tr. (11/13/01) 511:15–512:7; Meyer Tr. (11/13/01) 349:11–21. There was little or no such information about the Roanoke Plan. And, for the Richmond Plan, Wierwille used contract-specific historical financial data for 55 of the largest group contracts Trigon owned on January 1, 1987. Wierwille Tr. (11/13/01) 512:8–19; Plaintiff's Exh. 153 through Plaintiff's Exh. 206A.

Using that limited historical financial data, Wierwille determined contract-specific premium "benchmarks," which he then projected forward at a seven percent growth rate based on the historical pattern of the Medical Consumer Price Index. Wierwille Tr. (11/13/01) 517:18–518:10. Once annual premiums for each contract were determined, Wierwille applied the lifing curves to them to reflect the probability that the contract would still be with Trigon for each year in a 40–year projection period. This process resulted in a determination of contract-specific "probability weighted" premiums for each year in

the valuation projection period. Wierwille Tr. (11/13/01) 510:25–511:6.

Having determined the remaining useful life of each contract, Wierwille then determined the future cash flow expected to be produced by each contract over the remainder of its life.

### c. Fair Market Value Of Subscriber Contracts According To Wierwille

Wierwille then applied the line of business-level profit margin projections to the contract-specific probability weighted premiums to establish annual underwriting income for each subscriber contract. Wierwille Tr. (11/14/01) 553:2–12. Underwriting income, as modified to account for several other components required by the income approach, was then reduced to present value as of January 1, 1987, using a fifteen percent discount rate. Wierwille Tr. (11/14/01) 563:17–564:22. Wierwille then added an adjustment called a tax shield to this "discounted cash flow". Wierwille Tr. (11/14/01) 564:23–566:1. "The tax shield is designed to recognize that the buyer of this asset will be able to either amortize it or deduct it in some fashion and create a benefit which could be represented by the deduction against federal income taxes, and the tax shield is designed to capture the present value of that tax benefit." Wierwille Tr. (11/14/01) 565:3–9. This formula, according to Wierwille, results in the determined fair market value of each subscriber contract. Wierwille's opinion as to the fair market value of each subscriber contract owned by Trigon on January 1, 1987, is contained in

revised Appendix A to Plaintiff's Exh. 282. Plaintiff's Exh. 282A; Wierwille Tr. (11/14/01) 566:2–7. In Wierwille's initial opinion, the fair market value of the subscriber contracts, as of January 1, 1987, was $384,860,547, with the value of the cancelled or terminated contracts totaling $175,147,656. After submitting a .revised opinion at the end of trial, the adjusted fair market value was $308,450.72 in Wierwille's opinion,[18] with the total value of the cancelled or terminated contract as of December 31, 1995, being something less than $175 million.[19]

### 2. Valuation Of Provider Contracts (Method And Value)

■ As part of its business, Trigon also contracted with physician and hospital providers of health care services. These provider contracts allowed Trigon to reimburse the physicians and hospitals at rates lower than what the provider typically charged for their health care services. Wierwille expressed the opinion that a fair market value can be determined for each of the physician provider contracts Trigon owned on January 1, 1987. To determine the fair market value of Trigon's physician and hospital provider contracts, Wierwille used a "cost approach" methodology. Wierwille Tr. (11/13/01) 482:25–483:2, 483:25–484:8. Wierwille has used this same methodology to determine the fair market value of provider contracts on approximately 20 other occasions. Wierwille Tr. (11/14/01) 578:23–579:10. When asked why the income approach could not be used to value the provider contracts, Wierwille stated that there is no income to ascribe to those

---

**18.** This number was not explicitly stated in the record, rather, it is the simple addition of the total values of each of Trigon's lines of business in Wierwille's revised valuation. *See* Plaintiff's Exh. 282A. Such total value was confirmed by Trigon subsequent to a conference call with the parties on August 2, 2002.

*See* Letter from Gilbert E. Schill, Jr., counsel for Trigon, dated August 6, 2002.

**19.** The revised value of the total lost contracts is not evident in the record; however, van Miegham made the necessary adjustments to his revised refund calculations. *See* Plaintiff's Exh. 297A.

contracts because the discounts are passed onto the consumer. Wierwille Tr. (11/14/01) 742:19–22. Under the cost approach, the fair market value of an asset is determined by calculating the costs associated with reproducing or replacing the asset.

On January 1, 1987, Trigon owned provider contracts with 9,436 physicians, each of whom held a "Participating" contract, a "Key Care" contract or both. Trigon's Exhibit 74 (the "Provider Database") contains a summary of the Key Care and Participating physician provider contracts owned by Trigon on January 1, 1987, and the subsequent history of those contracts with Trigon.

Depending on the type of contractual relationship the physician held with Trigon, *i.e.*, a physician with a KeyCare contract, a Participating contract or both, there were different costs associated with replacing that contract. Wierwille Tr. (11/14/01) 572:23–573:6; Defense Exh. 103 at TR46012224. Specifically, Trigon management estimated the employee time that would have been required to spend to credential and contract with the physicians. Wierwille Tr. (11/14/01) 574:3–18. The costs associated with that time (salary and benefits) were then quantified by Trigon and Wierwille assigned a value to each of the physician provider contracts Trigon held on January 1, 1987, depending on the type of contractual relationship. Wierwille Tr. (11/14/01) 574:3–18; Defense Exh. 103 at TR46012224. This analysis resulted in a determination by Wierwille that the cost associated with replacing a physician provider contract was $52 if a physician had only a KeyCare or a Participating contract and $78 if a physician held both types of contracts. Wierwille Tr. (11/14/01) 574:19–25; Defense Exh. 103 at TR46012224.

Wierwille determined the fair market value, as of January 1, 1987, of Trigon's contracts with 9,441 separate physicians. Between January 1, 1987, and December 31, 1995, 3,381 of these contracts were cancelled or terminated, resulting in losses, measured by the fair market value of such contracts on January 1, 1987, of $207,896.

On January 1, 1987, Trigon also held contracts with hospitals and other health care facilities throughout Virginia. Many of those facilities had multiple contracts with Trigon, however, only one of these facilities, Smyth County Community Hospital, completely severed its contractual relationship with Trigon between January 1, 1987, and December 31, 1995. Wierwille employed a similar cost approach methodology to value facility provider contracts Trigon owned on January 1, 1987, including contracts with hospitals, home health facilities and nursing facilities. Wierwille Tr. (11/14/01) 579:16–580:20. As with the physicians, Wierwille examined the costs, as of January 1, 1987, associated with entering into contractual relationships with the facilities. Defense Exh. 103 at TR46012226. The estimated costs that Trigon would have incurred on January 1, 1987, to replace the Smyth County Community Hospital contract are a reasonable measure of the fair market value of that contract. The estimated unit costs associated with replacing the facility provider contracts are set forth in Defense Exh. 103 at TR46012239. To replace the Smyth County Community Hospital contract on January 1, 1987, Trigon would have incurred salary, benefit, overhead, and other costs. As of January 1, 1987, in order to replace the Smyth County Community Hospital contract, Wierwille opined that Trigon would have incurred costs of $36,507. Wierwille Tr. (11/14/01) 584:1–7.[20]

**20.** The major component of these costs is the Uniform Prepayment ("UPP") that Trigon is required to pay to cover claims that are expected to be incurred by the facility during

### 3. Computation Of The Tax Refund Due To Trigon By Dennis Van Miegham, Insurance Tax Specialist At KPMG

Trigon retained an expert witness to compute the amount of tax refunds to which it claims entitlement. A report prepared by Trigon's expert, Dennis van Miegham, an accountant who is an expert in insurance taxation, was provided to the United States on December 22, 2000. The United States has stipulated that van Miegham's methodology is correct and that, if Wierwille's valuation report is accepted and the Court determines that Trigon is entitled to the loss deductions, the refund amounts computed in van Miegham's report are correct. Stipulation of Undisputed Facts ("Stip."), ¶ 20.

Plaintiff's Exhibit 297A contains an updated computation of the refund amount, incorporating Wierwille's updated valuation opinions. Plaintiff's Exhibit 297A was introduced at trial after the testimony of Van Miegham and during Trigon's rebuttal case. Tr. (11/20/01) 1609:2–6. The United States reserved to right to object to the exhibit in a brief that would have been submitted a week subsequent to the introduction of the exhibit. Tr. (11/20/01) 1609:7–20. The United States informed counsel for Trigon and subsequently the Court that there was no objection to Van Miegham's calculation to the admission of such evidence. Since the United States has stipulated to Van Miegham's initial refund computation model, and did not object to the revised computations, the Court accepts the computations as accurate.[21] The revised computation results in

a refund, if any, of $33,181,966 exclusive of interest.

### F. Adequacy And Reliability Of Wierwille's Valuation Of Trigon's Contracts

 Trigon has the burden to establish by a preponderance of the evidence that it has overpaid the taxes it seeks to recover in this action. *Estate of Andrews v. United States*, 850 F.Supp. 1279, 1289 (E.D.Va.1994). The United States did not retain an expert to provide an opinion on the value of Trigon's subscriber and provider contracts. Instead, the United States has relied on the fact that Trigon bears the burden of proof to establish the fair market value of each of the subscriber and provider contracts and asserts that, for several reasons, Trigon did not satisfy its burden. As explained below, the United States is correct.

### 1. Valuation Of The Subscriber Contracts

The lion's share of the claimed refund is attributable to the valuation of Trigon's subscriber contracts. For the following reasons, the Court finds, as a matter of fact, that the Wierwille valuation of the subscriber contracts is neither accurate nor reliable.

#### a. Trigon Did Not Prove The Existence Of Each Specific Contract And The Number Of Contracts Is Inflated

As explained above, in late 1987 and early 1988, Meyer, Trigon's chief tax lawyer, set out to identify the subscriber (and

---

billing cycles. Wierwille Tr. (11/14/01) 582:3–1. This amount represents the cost of money to Trigon in not having the UPP funds on its balance sheet and available for investment. Wierwille Tr. (11/14/01) 582:3–1.

21. In a conference call on August 2, 2002, the United States stipulated on the record that, if the Court determined that the amount of loss in Wierwille's revised opinion were correct, then the tax computation in Plaintiff's Exhibit 297A would also be correct.

provider) contracts owned as of January 1, 19087. Meyer made a catalog of those contracts. Later, and in the context of this litigation, S. Owen Hunt, an attorney in Trigon's legal department, was assigned the task of ensuring the accuracy of the tax department's catalog of subscriber contracts, as well as the tax department's record of the subsequent history of the contracts. Hunt Tr. (11/13/01) 406:24–407:8, 408:13, 447:2–12. The results of Hunt's work are collected in Plaintiff's Exhibit 58, referred to as the "Subscriber Database."

To verify the existence of each contract as of the valuation date, Hunt and his staff reviewed a series of data files, Hunt Tr. (11/13/01) 412:6–413:8 and Plaintiff's Exh. 60, together with approximately 300 boxes of hard copy contracts and account profile documents. Hunt Tr. (11/13/01) 413:9–414:10. Hunt acted as an "auditor" in this process, removing contracts from the case if he could not verify the information. Hunt Tr. (11/13/01) 415:11–416:4.

At trial, Trigon presented Hunt's testimony together with the Subscriber Database, Plaintiff's Exhibit 282 and Plaintiff's Exhibit 282A as evidence of the group subscriber contracts owned by the company on January 1, 1987. The purpose of Hunt's work was to ensure that the refund claim contained only contracts that Trigon could verify were (1) owned on January 1, 1987, and (2) lost through termination during the 1987 through 1995 tax years. Trigon claims that the verification process was exhaustive, conservative in nature, and that it resolved all doubts against including contracts in the claim. Hunt Tr. (11/13/01) 423:14–425:16.

The United States has agreed that Plaintiff's Exhibit 58 is evidence of various group subscribers. Stip., ¶ 10. And, the United States has agreed that Plaintiff's Exhibit 58 is an admissible summary of the writings and records underlying which are business records. However, the United States says that these admissible documents and Hunt's supporting testimony are insufficient proof of the existence of the subscriber contracts that are the subject of Wierwille's valuation opinion.

As the United States points out, there are substantial gaps in the proof of the existence of the listed subscriber contracts that, in turn, cast serious doubt on whether the total number of subscriber contracts is accurate. The list was compiled by Hunt and persons working for him and at his direction. Hunt Tr. (11/13/01) 408:1–11. To begin, Hunt acknowledged that Trigon does not have paper documents for many of the contracts at issue.[22] Hunt Tr. (11/13/01) 441:2–20. Nor was there an electronic data base showing a list of all subscriber contracts existing on January 1, 1987, Hunt Tr. (11/13/01) 445:22–446:12, or a list of the contracts that subsequently had been cancelled, terminated or abandoned. *Id.* As a result, Hunt had to attempt to identify subscriber contracts from a variety of sources.

Hunt began with a data base provided by Trigon's tax department. Hunt Tr. (11/13/01) 447:2–5. Through Trigon's Product Profitability Reporting ("PPR") system, Hunt was able to verify the subscriber contracts for the Richmond Plan. Hunt Tr. (11/13/01) 447:24–448:8. At trial, Hunt testified that he had found "at least" 500 Richmond Plan contracts listed on the tax department's computer system as active on January 1, 1987, but which, in fact, had been cancelled before that date. Hunt Tr. (11/13/01) 448:12–18. Near the end of trial, and thereafter, Trigon says that

---

**22.** For small and community rated products standard form insurance contracts were issued, that are based on standard benefit packages. There is a limited number of product variations available in those markets. Hunt Tr. (11/13/01) 441:7–20.

Hunt found 793 such contracts.[23] While the record shows that Wierwille considered the erroneously included contracts in arriving at his valuation, they were excluded from the total number of lost contracts used as a basis for the deduction.

The fact that there were "at least" 500 errors in the list of the Richmond Plan's contracts also calls into question the accuracy of the total number of Roanoke Plan contracts because Hunt could not perform the same verification for the Roanoke Plan contracts for the reason that those contracts did not appear in the PPR system as of January 1, 1987. Hunt Tr. (11/13/01) 447:17–20 and 448:19–22. However, notwithstanding that he had discovered "at least 500" (actually 793) errors in the list of the Richmond Plan's contracts, Hunt accepted the Roanoke Plan list as correct simply stating that it was the company's best record of what transpired. Hunt Tr. (11/13/01) 449:2–10. The significant number of errors discovered through the verification of the Richmond contracts, sheds doubt as to the accuracy of the unverifiable Roanoke contracts. The number of errors found in the Richmond Plan contracts alone represents approximately 3.5% of the total number of contracts. This percent likely is much higher given the probability that a significant number of errors existed in the list of Roanoke Plan contracts.[24]

Furthermore, when Hunt's data comparison project was concluded, it became obvious that some of the Roanoke Plan's contracts listed on the tax department's data base as active on January 1, 1987, were missing from the PPR system for that date. Hunt Tr. (11/13/01) 450:7–13. In-

stead, those contracts appeared on the PPR several years later, *id.*, and Hunt could not say whether those contracts were belatedly entered into the PPR system, or whether the groups had cancelled before January 1, 1987, and then subsequently entered into new contracts that appeared on the PPR system. Hunt Tr. (11/13/01) 451:6–24. Hunt solved that conundrum merely by assuming that the insurance coverage had been continuous, Hunt Tr. (11/13/01) 451:25–452:16, notwithstanding the absence of supporting evidence for such a conclusion. Hunt Tr. (11/13/01) 452:17–22.

Next, Hunt acknowledged that he included in the data base subscriber contracts with groups that had cancelled Blue Cross/Blue Shield coverage and had moved to the HMO owned by Trigon's parent company, CHI. Hunt Tr. (11/13/01) 465:4–17. In including these groups on his list of active contracts, Hunt was aware that the HMO was a separate, non-Blue Cross/Blue Shield corporation. *Id.* The company at issue here is Trigon, a Blue Cross/Blue Shield organization affected by the Fresh Start Basis Rule. Evidence has not been presented that contracts that parties made with CHI, or other organizations within CHI's purview are Blue Cross/Blue Shield contracts to which the statute at hand applies. Therefore, on this record those contracts should not have been included as subject to the Fresh Start Basis Rule. Unfortunately, it is not possible to ascertain how many such contracts were affected by Wierwille's decision, nor did Wierwille explain how his opinion would be

**23.** *See* Letter from Gilbert E. Schill, Jr., counsel for Trigon, dated August 6, 2002.

**24.** As indicated previously, the Roanoke Plan was experiencing higher attrition than the Richmond Plan after the interplan competi-

tion. The Roanoke Plan's poor record keeping (as evidenced by the fact the contracts could not be verified) and higher attrition indicate a probability that the rate of error would be higher than that of the Richmond Plan.

affected by the absence of such contracts from his base.

Finally, the United States complains that some contracts owned by Trigon on January 1, 1987, were not signed until after that date. That is true but irrelevant, because an insurance contract is entered into when there is a meeting of the minds between the insurer and the group over the terms of coverage and the corresponding premium charge. For each of the unsigned contracts, a binding contract existed, evidenced by the contract itself or by the written correspondence regarding the terms of the contract, and supported by the conduct of the parties in providing insurance coverage and paying premiums. *See* Hunt Tr. (11/13/01) at 455:11–465:2.[25]

For the foregoing reasons, the Court finds, as a matter of fact, that the number of subscriber contracts that Trigon claims to have owned on January 1, 1987, (and used as a predicate for Wierwille's opinion) is inflated. The extent of that inflation was not testified to by Wierwille even after it was demonstrated in his trial testimony. But, the fact is that the inflation of the number of contracts necessarily results in an inaccurate total value. The failure to demonstrate the effect of this infirmity in a critically important component of Wierwille's opinion is an important factor in deciding whether Trigon has carried its burden of proving, by a preponderance of the evidence, the fair market value of the subscriber contracts.

**b. The Effect Of Wierwille's Failure To Verify The Calculations Made Under The Income Approach Against Calculations Using Other Valuation Approaches**

As explained above, Wierwille formulated his judgment about the fair market value of each specific health insurance subscriber contract that Trigon possessed on January 1, 1987, by using the income approach, a generally accepted approach to valuation under certain circumstances. Wierwille Tr. (11/13/01) 481:7–16 and 482:6–9. To that end, Wierwille reviewed lists of Trigon's contracts allegedly owned on January 1, 1987, and designated for each contract an amount that he claimed was its fair market value. Plaintiff's Exh. 282 and Plaintiff's Exh. 282A; Wierwille Tr. (11/13/01) 480:2–11. Plaintiff's Exhibit 282 contains Wierwille's original conclusions of value. Later, he corrected his valuation conclusions, reducing the values by three to seven percent. Wierwille Tr. (11/14/01) 566:13–568:6. The modified values are set forth in Plaintiff's Exhibit 282A.

Wierwille's opinion on valuation was based solely on the income approach and, specifically, the discounted cash flow method in valuing Trigon's subscriber contracts. Wierwille Tr. (11/13/01) 482:20–24; 487:5–14. Dr. Foster, the United States' expert on valuation methodologies, testified that the:

---

**25.** *See generally* 1 Couch on Insurance, § 13.1, at 13–2 to 13–3 (1996) (noting that prior to issuance of a formal policy, group insurance coverage is typically governed by a binder, "which may be temporary, sketchy, and informal, but is nonetheless a contract"); *see also id.* § 8.3, at 8–10 ("The effective date of coverage when the master policy commences is, as in the case of other types of insurance, a matter of the agreement between the parties ...."). Documents exchanged in advance of the actual signing of the contract, together with policy forms filed with the Bureau of Insurance, were honored as evidence of the contract, and Trigon would pay claims incurred during that period. Hunt Tr. (11/13/01) 461:1–462:25. For Trigon's non-experience rated lines of business, standard form contracts were used, so there would never be a question as to the terms of coverage. Hunt Tr. (11/13/01) 463:21–464:11.

discounted cash flow approach is an approach that looks into the future and makes estimates about future parameters. And nobody's a clairvoyant. And there are good ways of making projections and there are less good ways of making projections. And what you concern yourself with a discounted cash flow approach is are there reliability checks on the inputs to the discounted cash flow, you can basically get such a large range of numbers that in the end you don't have a grounded reality in terms of valuation.

Foster Tr. (11/16/01) 1230:5–17. According to Dr. Foster, the income approach, discounted cash flow method is very sensitive to its inputs. Foster Tr. (11/16/01) 1230:3–1231:16. Robert F. Reilly, Trigon's rebuttal expert on valuation method agreed with Dr. Foster on that point. Reilly Tr. (11/20/01) 1574:22–1575:4.

Dr. Foster also testified that fair market valuations are most reliably accomplished by using different methods of valuation to cross-check the validity of the method principally relied upon. Foster Tr. (11/16/01) 1218:17–1223:6. That cross-checking sometimes is called "triangulation." It is undisputed that Wierwille did not cross-check his valuation against figures obtained by using other methods. Foster Tr. (11/16/01) 1220:12–1223:6; *See also* Reilly Tr. (11/20/01) 1573:10–15.[26]

It was Dr. Foster's professional opinion that Wierwille's failure to cross-check the analysis produced by the income approach rendered Wierwille's opinion substantially less reliable. According to Dr. Foster,

Wierwille should have applied the cost approach to value Trigon's subscriber contracts. Dr. Foster described that approach as a "make or buy" analysis. Foster Tr. (11/16/01) 1231:17–1233:6. As explained by Dr. Foster, an appraiser using the cost approach would determine the cost that Trigon—or a hypothetical buyer—would have incurred to develop the set of subscriber contracts that were owned by Trigon on January 1, 1987, as well as the future costs it would have incurred to maintain those assets into the future. Foster Tr. (11/16/01) 1231:17–1232:9. That, of course, is basically the same approach utilized by Wierwille to value the provider contracts. Wierwille never satisfactorily explained why the value of the subscriber contracts under the income approach could not have been verified by the same cost approach being used for the provider contracts.[27]

Wierwille also testified that he had considered the market transaction approach to ascertaining the fair market value of the subscriber contracts, but he rejected that approach because of the lack of data on comparable transactions. Wierwille Tr. (11/13/01) 483:3–484:8. Nonetheless, the record shows that there have been market transactions involving similar contracts that could have been used to cross-check valuation under the income method. Indeed, both sides agree that market of transactions involving subscriber contracts took the form of the purchase of blocks of contracts or the purchase of a company with a portion of the purchase price associated with the subscriber contracts. Trigon

---

**26.** "Q. Mr. Reilly, I want to talk about the multiple methods first. As I understand it, whenever possible an appraiser should use more than one approach to valuation, would you agree?

A. Yes, more than one approach and if possible, more than one method within an approach."

**27.** That Wierwille, in fact, used unreliable data to value the provider contracts using the cost approach (*see infra*), would not have foreclosed the use of reliable data either there or in cross-checking the subscriber contracts.

itself considered purchasing the assets or stock of health insurers whose assets include subscriber contracts. However, for reasons neither expressed nor readily apparent, Wierwille claims that he could not lay his hands on the data respecting market transactions, even those considered by Trigon.

Neither Wierwille nor Reilly, Trigon's rebuttal expert and coauthor of a leading treatise on valuing intangible assets,[28] agreed that cross-checking or triangulation was absolutely necessary to arrive at a reliable outcome utilizing the income approach. However, unlike Wierwille, Reilly is of the view that cross-checking a valuation by use of different methods is a preferable course. And, notwithstanding that triangulation is important to the veracity of a valuation opinion, even Dr. Foster acknowledged that fair market value can be determined using only one valuation approach. Foster Tr. (11/16/01) 1280:14–1281:3. He also agreed that it is permissible to rely on the income approach if it is the only approach available. Foster Tr. (11/16/01) 1282:22–1283:15.

On this record, and considering the wide-spread use of the income approach, it cannot be said, as the United States argues, that the fair market value opinion here is invalid and inadequately supported merely because Wierwille used the income approach without triangulation or cross-checking against results achieved by using other methods. However, Wierwille's failure adequately to explain why the cost approach could not have been used as a cross-check or why the market transaction data—even that from Trigon's own forays into the market—was not developed raises further serious doubt about the reliability of Wierwille's unverified, unchecked opinion, based, as it is, on the income approach.

As Dr. Foster explained, and Reilly agreed, when the income approach alone is the basis for valuation, it is critically important that the data used in applying that approach be accurate. Foster Tr. (11/16/01) 1230:3–1231:16; Reilly Tr. (11/20/01) 1535:15–1536:18. That is especially true because, as Dr. Foster explained, although it may be necessary to rely exclusively on the income approach on rare occasions, the income approach, depending on the inputs, can result in a "large range of numbers." Foster Tr. (11/16/01) 1230:3–17, 1233:23–1234:2.

The record here fully bears out this problem. For instance, although the income approach has been used by other experts to estimate the value of subscriber contracts owned by other Blue Cross/Blue Shield organizations, the use of that approach has produced widely varied results for other plans with premium income similar to Trigon's. (*See* Defendant's Exh. 22, a list of several Blue Cross/Blue Shield plans, their 1986 premiums, and the total values placed on their health insurance contracts). For example, the Cincinnati, Ohio Blue Cross/Blue Shield had premiums of $1.36 billion-very similar to Trigon's $1.3 billion (Wierwille Tr. (11/14/01) 736:19–21)–yet the value placed on Cincinnati's contracts was only $122 million. This is in stark comparison to Wierwille's valuation of Trigon's contracts at $384 million, or even Wierwille's revised figure of $308 million. Wierwille Tr. (11/14/01) 737:2–4. The Pennsylvania Blue Shield had premiums of $1.4 billion and the value placed on its contracts was only $100 million. New Jersey had premiums of $1.8 billion and the value placed on its premiums was only $287 million.

---

**28.** Michael D. Pugh, an expert for the United States, testified that he had researched market transactions involving health insurance subscriber contracts but "couldn't find any consistent presentation of that information." Pugh Tr. (11/15/01) 1049:6–21.

The most dramatic variance in the application of the income approach, however, appears in two different valuations of the subscriber contracts here at issue. Defendant's Exhibit 25 shows the valuation performed for Trigon by Arthur Andersen in 1988, which Trigon relied on in submitting its original claim to the IRS in 1996. Meyer Tr. (11/16/01) 1114:18–1118:14. Arthur Andersen, using the same approach as Wierwille and valuing the same contracts, concluded that the subscriber contracts had a value of $1,325,543,000–more than three times the value assigned by Wierwille. Defense Exh. 25 at TR01020028.

The fact that Arthur Andersen and Wierwille reached such divergent results applying the same approach to the same contracts calls into serious question both results. That is especially true where, as here, Wierwille did not explain why his valuation was so widely divergent from the one used by Trigon to support its claim initially. Indeed, absent such an explanation, there is justification for rejecting both valuations.

However, that disparity and the previously explained deviations from the valuation obtained by applying the income approach to other similarly situated Blue Cross/Blue Shield plans demonstrates quite clearly that valuation results will only be reliable if the inputs are accurate. Hence, the lifing and income stream components, as well as any other adjustments included or omitted from the calculus, must be closely scrutinized, because any deviation will multiply the inaccuracy of the final result. It is thus necessary now to evaluate the several inputs to the income valuation approach that are in significant dispute here.

### c. The Inputs Used By Wierwille Were Unreliable

Reviewing the facts that are the basis of the lifing analysis, the future cash flow calculations, the discounting adjustments, and the other figures important to the accurate and reliable calculation of the fair market value of the subscriber contracts under the approach used by Wierwille, the Court, for reasons outlined below, finds, as matters of fact, that Wierwille used inputs that consistently inflated the purported value and life of Trigon's contracts [29] and that the valuation on which Trigon relies is unreliable and inadequate to carry its burden of proof.

### (i) Wierwille's Lifing Analysis Is Overstated

Wierwille's lifing analysis, the purpose of which was to determine how long Trigon's contracts could be expected to generate income, was the starting point for his valuation. Evaluating the lifing analysis, it is clear that the analysis fails to provide accurate and reliable proof of the average remaining lives of a specific and reliable number of contracts.

### (1) Wierwille Relied on Incomplete or Unverifiable Data

In conducting this analysis, Wierwille predicted future attrition by looking at historical attrition rates. Wierwille Tr. (11/14/01) 643:13–17. He relied on contract cancellation data provided to him by Trigon for the years 1984–1986, Wierwille Tr. (11/14/01) 639:23–640:3. As explained previously, the data was confirmed only for the Richmond Plan's subscriber contracts and even that was questionable, but it was not confirmed at all for the Roanoke Plan's contracts. Wierwille Tr. (11/14/01) 640:4–

---

**29.** Both Dr. Feldstein and Dr. Foster concluded that Wierwille had used unreliable inputs. Feldstein Tr. (11/19/01) 1355:7–1359:15 and 1375:20–1376:17; Foster Tr. (11/16/01) 133:23–1236:21.

10. With no supportable lifing data for the Roanoke Plan's contracts, there is significant doubt as to the accuracy of the lifing analysis, to the extent it relates to that plan's contracts and thus to the analysis as a whole.

### (2) The Attrition Rates Were Skewed As A Result Of The Interplan Competition

Given that the interplan competition lasted from July 1983 until November 1985, much, if not all of the three year period relied on by Wierwille was influenced by the interplan competition. The intensity of the competition was so great that the commercial health insurers operating in Virginia stopped marketing in the geographic regions covered by the plans during this period. Davis Tr. (11/12/01) 175:2–12; Cothran Tr. (11/12/01) 232:22–233:21. Furthermore, the Richmond and Roanoke plans' aggressive pricing strategies and the corresponding absence of competition from commercial insurers caused enrollment for both plans to grow during the period from 1982 to 1985. Joint Exh. 2 at TR01092306.[30] Given these facts, it is logical to conclude that the effect of the interplan competition led to understated attrition because the lower premiums offered by Trigon during this period acted as an incentive for subscribers not to terminate a contract with Trigon. With skewed contract lifing, the value of the contracts were ultimately overstated.

### (3) Wierwille Failed To Consider The New Competitive Atmosphere

Although Trigon determined that the Roanoke Plan, following the interplan competition, was experiencing higher attrition

than the Richmond Plan (Plaintiff's Exh. 42 at TR46012014), Wierwille could not recall if he was aware of this fact and neither his report nor his testimony indicate that he was aware of it. Wierwille Tr. (11/14/01) 640:16–22. However, some documents on which Wierwille relied actually predicted declining enrollment because of the re-entry of commercial carriers and the change in the health care industry. Joint Exh. 1; Plaintiff's Exh. 32. The fact that Wierwille either ignored or overlooked the expert predictions of management about significant enrollment decline calls his attrition analysis into serious question.

### (a) Background Information

This point requires further amplification. First, the record shows that, in February, 1986, Trigon's consultants reported that "CHI and other Blues will face increasing margin pressures as provider-based systems start price wars; these wars will be protracted, and will likely result in the demise of some Blue plans." Defense Exh. 18 at TR22330187. Second, the December 18, 1986, Three Year Financial Plan for CHI expressly warns that "[p]rotracted price wars are increasingly likely as competitors jockey to capture market share." Joint Exh. 2 at TR01092303. Third, Trigon's 1987 Business Plan states "[m]any carriers, traditional and ADS, are using aggressive rating tactics, substantially underpricing products which match our benefits, limiting our ability to attract new business and retain current business. Most of our business losses have been because of rates." Plaintiff's Exh. 32 at TR01041080.

After the interplan competition ended, the merged company was concerned that,

---

30. TR01092306 states that "[t]otal enrollment grew from 1982 to 1985 due to aggressive pricing strategies."

if it raised premiums abruptly, it would experience a significant loss of insured groups. Cothran Tr. (11/12/01) 226:22–228:4. Trigon accordingly developed a plan to gradually raise premiums over a three year period, beginning in 1986. *Id.* However, Trigon anticipated that commercial carriers would renew active marketing within Virginia as a result of its higher premiums. Cothran Tr. (11/12/01) 241:6–242:13; Joint Exh. 1 at TR01090826 ("[r]ate discounts initiated during the inter-plan competition continue to adversely impact underwriting results. The recovery of these discounts is slowed by the increased competitiveness of commercial insurers as well as by competition from Alternative Delivery Systems."), Joint Exh. 7 at TR22440085 ("[t]he Plans' ability to restore pricing to the general competitive level will be constrained by competition and customers' level of tolerance for price increases."). Trigon expected that its commercial competitors would attempt to increase their market share by selling health insurance below their actual cost. Cothran Tr. (11/12/01) 239:15–240:5; Defense Exh. 9 at TR22330320 (stating that under the "most likely" scenario "Pricing, however, is aggressive as new competitors attempt to buy market share.").

In addition to the return of old competitors who had sat out the interplan competition, Trigon was expecting competition from insurers new to the market. Cothran Tr. (11/12/01) 231:25–232:16; Joint Exh. 6 at TR01091261. As explained in Plaintiff's Exhibit 32 (Trigon's 1987 Business Plan) at TR01041079:

> Competition in Virginia is representative of the rapid changes taking place in the health care industry nationwide. There is a surge of activity by traditional competitors and an influx of new and innovative competitors. Commercial carriers, alternative delivery systems and hospital/insurance company alliances are all aiming at our traditional market. The

field is constantly changing with the introduction of new competitors and new products.

Trigon expected that it would have to continue its premium discounts in response to this new competition. Cothran Tr. (11/12/01) 241:3–17. In March of 1986, Cothran wrote to the board of directors of CHI regarding Trigon's effort to recover from the interplan competition that "offsetting this margin improvement will be the rate discounts required to compete against the Plan's new competitors." Defense Exh. 9 at TR22330321. Trigon also expected that increasing competition would cause the health insurance market to become fragmented and that the changes taking place in the industry would accelerate. Joint Exh. 6 at TR01091260–61 ("The next three-year period is projected to be one when we will see a continuation and in fact an acceleration of many of the changes which have begun in the last two years in the fundamental structure of health care delivery." . . . . "The market is expected to become increasingly competitive and fragmented with the large for profit providers of care being a greater competitive factor, commercial insurers increasing their emphasis on the health market. . . . ").

### (b) Effect Of Competition On The Wierwille Lifing Analysis

The lifing analysis is made without factoring in the undisputed fact that, for other reasons, the competitive environment was abnormal. For example, Trigon's executives consistently testified that commercial health insurers sat "on the sidelines" during the interplan competition. Although Wierwille was aware of this fact, Wierwille Tr. (11/14/01) 649:25–650:21, the data on which Wierwille relied did not reflect the impact of the absence of competition with commercial carriers, nor did

Wierwille adjust the lifing analysis to account for the aberrational market in existence when he determined the expected life of the subscriber contracts. Nor does Wierwille's lifing analysis reflect that Trigon's management expected increased competition with commercial insurers after the interplan competition ended. Wierwille Tr. (11/14/01) 651:19–652:1. Although Wierwille was aware of strong evidence about this obvious factor bearing on contract terminations, he did not adjust his attrition analysis to reflect the effect of that increased competition. *Id.*

### (4) Monumental Changes In The Health Care Industry Should Have Been Considered

#### (a) Background Facts

By January 1, 1987, the health care insurance industry was undergoing fundamental changes in the way in which it provided coverage. Cothran Tr. (11/12/01) 231:22–24. Trigon's management viewed it as a "chaotic" time. Cothran Tr. (11/12/01) 231:15–21. A February 12, 1986, presentation to Trigon's board of directors by its consultants, Booz, Allen & Hamilton, stated:

> The health care environment is undergoing a revolution. Payers (governments and employers) have been staggered by the accelerating spiral of health benefits costs-and have finally reacted by imposing a series of measures which effectively slash utilization.

Defense Exh. 18 at TR22330187.

The cost of medical care during the early 1980's had been escalating rapidly, forcing a corresponding increase in health insurance premiums. Palmer Tr. (11/15/01) 973:17–974:7; Joint Exh. 2 at TR01092305 ("[m]edical care costs continue to outpace the increase in the overall rate of inflation as measured by the CPI or the GNP Implicit Price Deflator. This trend is expected to be exacerbated during the 1987–89 forecast period as medical care costs are fueled by general inflationary increases ...."). Less expensive managed care products were increasingly replacing the comprehensive policies traditionally offered by Blue Cross Blue Shield plans. Feldstein Tr. (11/19/01) 1335:18–1336:17. Managed care products relied on deductibles, employee cost sharing, restricted choice in physicians and hospitals, and utilization review to keep premiums low. Feldstein Tr. 1336:22–1337:11. Specifically, managed care health insurance products involving Preferred Provider Organizations ("PPOs") and Health Maintenance Organizations ("HMOs") were becoming increasingly popular. Trigon predicted a "steady shift" of consumers away from its traditional products to newer managed care products. Joint Exh. 6 at TR01091262 ("[w]e expect over the next three years our mix of business will change from today's eighty-four percent traditional full service product level to a mix of thirty percent full service and seventy percent copay, KeyCare, or HMO products.").

Blue Cross/Blue Shield plans, including Trigon, lagged behind commercial health insurance companies in offering these new managed care products. Feldstein Tr. (11/19/01) 1344:21–1345:2. In 1986 and 1987, Trigon did not offer an HMO. Its parent company, CHI, offered an HMO product through a separate corporation. But that product was only offered in limited areas of Virginia. Cothran Tr. (11/12/01) 236:1–23. Trigon was, however, competing against these new products being offered by other insurers. Feldstein Tr. (11/19/01) 1345:3–16.

Cothran testified that she considered the HMO offered by Trigon's parent to be a start-up product. Cothran Tr. (11/12/01) 238:12–14. This fact was echoed in CHI's 1987 Operational Plan. There, the company

warned that "[m]any of the Insurance Group's new products (HMOs, TPA, Flexible Benefits, etc.) are in the development stage and will post near term losses." Joint Exh. 4 at TR01091745. Cothran also recognized that, in marketing the new HMO products, Trigon would be unable to use its historic image as a traditional indemnity insurance company. Cothran Tr. (11/12/01) 238:15–20. *See also* Defense Exh. 9 at TR22330320 ("CHI will need to build on the traditional image of the Blue Cross company as the community service plan but enhance the image to being the 'full line carrier of health benefits products.' With this new market image will come several critical tests-the attractiveness of the product design, the ability to price against our deep pocket competitors, the ability to control the 'anti-selection' impact inherent in the multi-choice environment, and the ability to service the integrated line of products.").

The industry shift to managed care raised concerns among Trigon's management regarding "adverse selection", *i.e.,* the migration of healthy individuals to lower priced products. Joint Exhibit 1 at TR01090826 states that "[c]ompetition from Alternative Delivery Systems including dual-choice and multi-choice programs continues to fragment our business by targeting the best risks and creating anti-selection problems in the Plan's traditional product lines." Adverse selection results in an unbalanced risk pool. Palmer Tr. (11/15/01) 977:13–978:14. Consolidated Healthcare's 1986 projections explain this result, stating:

> By targeting smaller segments within groups through mandated "dual choice" options, HMO's and other Alternative Delivery System plans increase the risk characteristics of the Plan's subscriber base by attracting the younger, healthier individuals. This in essence destroys the concept of group insurance by segregating the risks in a group between two or more carriers or medical plans. This phenomenon of anti-selection will be one of the primary forces to be managed and controlled during the forecast period.

Joint Exh. 2 at TR01092312. Likewise, Joint Exhibit 2 at TR01092312 states that:

> Anti-selection occurs because the Plans have traditionally offered the highest benefit levels of any carrier (Full Service Benefits) with generally free choice of providers. This benefit level and this freedom of choice are most likely to appeal to those individuals with ongoing medical problems and to older subscribers with established physician relationships. Thus, given an option, the chronically ill and the elderly would be expected to retain their traditional Blue Cross and Blue Shield coverage. This gives rise to anti-selection and results in even higher future costs and future trend levels.

*See also* Joint Exh. 4 at TR01091074 ("The tendency of young, healthy subscribers to participate in these alternative delivery systems creates adverse selection and makes increasingly difficult our traditional role as the community service carrier and insurer of last resort.").

Trigon anticipated that anti-selection would erode the profitability of its contracts. Feldstein Tr. (11/19/01) 1352:14–1353:6. *See also* Joint Exh. 2 at TR01092312 ("This gives rise to anti-selection, and results in even higher future costs and future trend levels").

### (b) Effect Of Changes In Industry On Valuation

While performing his lifing analysis, Wierwille knew that Trigon's management expected its insureds to migrate from its traditional indemnity products to new managed health care products. Wierwille Tr. (11/14/01) 672:24–673:5. That, of course, reflected the then-changing face of

the health care insurance industry, but Wierwille did not take that into account in his lifing analysis. For instance, new managed care products were being offered by CHI, a Trigon-related company which was not part of the Blue Cross/Blue Shield plan. Wierwille Tr. (11/14/01) 673:10–16. Although Wierwille's mission was to determine the value of the contracts to a Blue Cross/Blue Shield plan, he did not consider it a termination if an insured group left such a plan to contract for managed care products offered by CHI. Wierwille Tr. (11/14/01) 673:17–674:3. "To the extent that there were cancellations, not cancellations, but migration of entire groups from traditional insurance to the HMO or TPA during the period '84 through '86, I did not consider those to be terminations." Wierwille Tr. (11/14/01) 676:16–20. Again, Wierwille did not adjust his attrition rate to reflect the expected migration away from Trigon. Wierwille Tr. (11/14/01) 673:6–9. That, of course, casts further doubt on the reliability of the lifing analysis.

### (5) Bottom Line Results Of The Lifing Analysis Are Dubious

To begin, there is some confusion, and important confusion at that, as to what the results of the lifing analysis actually reflect. In Trigon's case-in-chief, Wierwille testified that, and Plaintiff's Exhibit 282 includes information that indicates that, on January 1, 1987, Trigon's contracts had *average remaining lives* of 12 to 14 years depending on the line of business. Plaintiff's Exh. 282 at Tab IV.1; Wierwille Tr. (11/14/01) 653:21–655:21. There he specifically interpreted the exhibit as showing "average remaining life." Wierwille Tr. (11/14/01) 653:21–655:21. For example, he testified concerning the exhibit:

Q. And a contract that had a one year life in that group had an average remaining life in its first year of 14 years; is that correct?

A. That's what it shows.

Q. And then a contract that had lasted 14 years still had, or at that point had a 26 year remaining life, is that what you are showing?

A. That's right.

. . . .

Q. And then under the community rated you have what is that, a one year old contract has a average remaining life of 13 years?

A. Yes.

Q. And then that runs pretty consistent, it dips down, winds its way around to about 14 years eventually?

A. Right.

Q. And then your small business contracts, they also have—well, they have a 12 year. A one year old contract in small business has a average remaining life of 12 years?

A. Right.

Wierwille Tr. (11/14/01) 654:18–655:21.

During his rebuttal testimony, Wierwille made a significant turnabout, asserting for the first time that Plaintiff's Exhibit 282 at IV.1 incorrectly stated that it reflected average "remaining" life. Wierwille Tr. (11/20/01) 1623:10–1624:6. He claimed, instead, that the exhibit actually showed "total life" and that he had known that the exhibit was in error for "some time" but did not notify the United States. *Id.* Wierwille then asserted that the average remaining life that he calculated actually was roughly six years. Wierwille Tr. (11/20/01) 1622:25–1623:9. This is inconsistent with his report and with his description of the exhibit during Trigon's case-in-chief. The Court does not credit Wierwille's revisionist testimony.

Wholly apart from the fact that Wierwille gave conflicting testimony about his own lifing analysis, there remains the fact

that Wierwille's figures are significantly at odds with the testimony of Carl Slone, Trigon's Vice–President of Sales throughout the relevant period. Slone, whose job was to know these facts, testified that, depending on the size of the contracts, Trigon would keep accounts for two to three years. Slone Tr. (11/13/01) 318:20–319:1. Although Slone acknowledged that the best source for information on contract life would be the company's records (which is allegedly what Wierwille relied on), Slone Tr. (11/13/01) 319:17–23, those records, as explained previously, are of doubtful provenance.

In estimating Trigon's attrition rates, an expert for the United States, Dr. Paul Feldstein, took Trigon's management's own projections, which indicated attrition at a minus 5.5 percent, and took the difference between that projection and the 2 percent increase in attrition used by Wierwille, resulting in a 7.5 percent differential. Dr. Feldstein added the 7.5 percent to Wierwille's attrition rates. Feldstein Tr. (11/19/01) 1373:10–24.

Dr. Feldstein opined that it was unreasonable for Wierwille not to anticipate higher attrition rates after January 1, 1987. According to Dr. Feldstein, Wierwille assumed that the removal of competitive discounts would have no affect on attrition, which is contrary to the fact that the subscribers were acutely price sensitive. Feldstein Tr. (11/19/01) 1375:20–1376:3. He added that Wierwille did this in spite of Trigon's own forecasts of lower enrollment in following years and when Trigon's own strategic plan discussed adverse selection, increased competition and many of the other factors indicating that enrollment would be down and attrition would be higher. Feldstein Tr. (11/19/01) 1376:2–9; Joint Exh. 1 at TR01090826. The record as a whole, including the contemporaneously recorded views of Trigon's

management confirm that Dr. Feldstein was correct.

In sum, the lifing analysis is a vital component of a valuation under the income approach and the lifing analysis here is unreliable. It proceeds from questionable data respecting the identity and number of contracts and was made without consideration of many factors unique to these contracts that are highly pertinent to assessing their remaining life. And, the analysis is at odds with the testimony of the Trigon executive whose every day responsibility it was to know the duration of the company's contracts. Furthermore, it is evident from Dr. Feldstein's testimony and from Trigon's own documents that Wierwille did not credit the forecasts of Trigon, nor did he heed the admonition that the "Plan faces the most challenging era in its history." Joint Exh. 1 at TR01090826. On the facts of this record, this critical component of the determination of fair market value must be found wanting. Therefore, the Court finds, as a matter of fact, that the errors with the lifing analysis make Wierwille's valuation inaccurate and unreliable.

### d. Wierwille's Profit Margins And Estimated Future Incomes Were Not Reliable

The second input on which Wierwille relied in his valuation was the income stream that Trigon's subscriber contracts would earn over their remaining life. As Wierwille was aware, profit margins in the health care industry were typically low and, reflective of that circumstance, Trigon's historical profit margins over the fifteen years prior to the valuation date had a weighted average of less than one percent. Wierwille Tr. (11/14/01) 698:2–699:13; see also Davis Tr. (11/12/01) 189:14–19 (when asked whether the health insurance industry was historically a low margin industry, Davis replied that "It

typically runs in the 1 to 2 percent—range of 1 to 2 percent"). In projecting the income stream, Wierwille used profit margins of 2.46% for 1987, 2.37% for 1988, 3.01% for 1989, 3.17% for 1990, 3.90% for 1991 and 4.97% for 1992. *See* Defense Exh. 103 at TR46012290–91. After 1992, Wierwille used a weighted average of 5.4%.

Wierwille's justification for using, in his valuation, these very high average profit margins that far exceeded the industry average and Trigon's historical experience, was that "[p]rofit margins in the past are not necessarily going to be predictive of the future if the facts have changed." Wierwille Tr. (11/14/01) 711:20–712:20. That explanation simply does not square with the record and is thus not credible.

First, Wierwille's explanation ignores the fact that the industry in which Trigon operated was a low margin industry. To use two to five fold increases in profit in valuing a company in that industry would require strong justification to be credible. Wierwille offered no such justification.

Second, Wierwille's explanation depends upon a change of facts that would support a substantial increase in profits. In the critical time period, Trigon was confronting changes in the facts that had kept its profitability at less than one per cent. But, the changes were harbingers of worse, not better, times to come.

This is illustrated by the two internal Trigon documents that Wierwille used as a starting point for his underwriting profit projections and that were the official views of Trigon's management in late 1986 about the company's future for the next three years, 1987 through 1989. The first was a memorandum dated August 25, 1987, which included a three-year financial forecast approved by Trigon's board on December 18, 1986. *See* Plaintiff's Exh. 32

(Trigon's 1987 Business Plan) at TR01041118–1123. The other was a three-year financial forecast dated December 18, 1986. *See* Joint Exh. 1; *Trigon's Opening Post–Trial Brief*, at 31–32; Wierwille Tr. (11/13/01) 535:2–536:2; Wierwille Tr. (11/14/01) 697:4–9. It is difficult to discern how those documents permit a credible forecast of increased underwriting profit margins of two to five times the company's previous long term experience.

The document entitled "BLUE CROSS AND BLUE SHIELD OF VIRGINIA THREE YEAR FINANCIAL FORECAST AND 1987 EXPENDITURE REQUESTS," dated December 18, 1986, is instructive. Joint Exh. 1. It begins by describing the plan's environment, articulating that the plan is in the "most challenging era in its history." It recognizes that, in the words of the familiar folk song "the times, they are a-changin' " [31] in the health care industry generally, and particularly in Virginia in the coming three years. It then identifies serious new competitive threats from commercial insurers and alternate health-care delivery systems. It continues the litany of difficulty by forecasting significant increases in medical costs. It explicitly predicts continued adverse impacts from rate discounts in the interplan competition. And, it forecasts declining enrollment for the three year period.

The second document reflects a three year financial forecast as approved by Trigon's board of directors. Plaintiff's Exh. 32 (Trigon's 1987 Business Plan). It sounds the same themes as appeared in the December forecast. In perspective of this difficult, threatening and changing environment, Trigon's management predicted an underwriting *loss* of $4.9 million in 1987 and underwriting profits of $9.7 million and $43.8 million in 1988 and 1989 respec-

---

**31.** *See* Bob Dylan "The Times They Are A–

Changin' " (Album Released: Feb. 10, 1964).

tively. In contrast, Wierwille forecasted a profit of $33.9 million in 1987, $36 million in 1988 and $50.8 million in 1989.[32]

Wierwille says that he achieved this result by assuming that the projections made by management were correct (Wierwille (11/14/01) 713:4–25), and by adding to those figures the premium discounts that had been given during the interplan competition. Wierwille Tr. (11/14/01) 700:22–23. For 1986, this meant $53 million was added to Trigon's revenues. Wierwille Tr. (11/14/01) 701:21–25. For 1987, Wierwille added $39 million to Trigon's projected revenues and in 1988 he added $27 million. Wierwille Tr. (11/14/01) 702:5–9. *See* Plaintiff's Exh. 32 (Trigon's 1987 Business Plan) at TR01041119.

Thus, in 1987, management had forecast a loss of $4.9 million but, with the addback of $39 million, Wierwille forecast a profit of 2.46% of the projected premiums or approximately $34 million. In 1988, management forecast a profit of $9.7 million, and Wierwille added back $27 million, forecasting a profit of 2.37% of the projected premiums or approximately $36 million. Finally, though Plaintiff's Exhibit 32 clearly states that the premium discounts resulting from the interplan competition would be zero in 1989,[33] it appears that Wierwille added the $7.25 million projected premium discount for that year onto the $43.8 million projected management forecast to come up with the profit forecast of 3.01% of the projected premiums or approximately $51 million. Suffice it to say, Wierwille's projections are significantly at odds with Trigon's own projections and are not at all reflective of the difficult competitive situation extant at the valuation date.

### (i) Premium Discounts Should Not Have Been Added Back

Addbacks of the premium discounts was done notwithstanding that, at the valuation date, management was forecasting both continued adverse effects (at least for three years following the interplan competition, 1986–1988) of the discounts given during the interplan competition and a significant increase in price competition from commercial insurers and alternate delivery systems. Dr. Feldstein explained that premium discounts should not have been added back because management had made a forecast based on the most likely scenario of what their underwriting profit margins would be and took into consideration in their forecasts the phasing out of the competitive discounts. Feldstein Tr. (11/19/01) 1355:7–1356:1. Dr. Feldstein's testimony on that point is entirely credible, while Wierwille's approach is utterly inconsistent with management's own expert view of the future.

Moreover, at least for 1987 (and longer for contracts of more than a year's duration), a prospective buyer would be bound by the premium discount that Wierwille added back. That simply defies logic because a buyer could never assume such a scenario. And, for 1987 and 1988, and perhaps 1989, the buyer could not significantly raise premiums because of competi-

**32.** Wierwille utilized percentages of projected premiums for his underwriting profit margins. Thus, the dollar figures above are converted from his percentages using Trigon's total projected premiums of $1,376.4 million, $1,522.1 million and $1,688 million in 1987, 1988 and 1989 respectively. *See* Plaintiff's Exh. 32 at TR01041123 and Defense Exh. 103 at TR46012290 (the Wierwille Report). These projected premiums were approved by Trigon's Board of Directors on December 18, 1986.

**33.** Plaintiff's Exh. 32 at TR01041119 under the heading "COMPETITIVE DISCOUNTS". Wierwille stated that he added back the amount of premium discounts attributable to the interplan competition.' Wierwille Tr. (11/14/01) 700:22–23.

tion and because the state and local governments pressured Trigon not to increase the premiums drastically back to normalize rates. Davis Tr. (11/12/01) 163:5–165:1.

Wierwille simply ignored these facts, just as he ignored the facts of the adversely changing environment that did not bode well for increasing profitability in the valuation period. As a result, Wierwille's profit projections are neither credible nor reliable.

### (ii) Feldstein's Projections Are Commensurate With Past Profit Margins

Dr. Feldstein performed an underwriting profit margin projection based on the forecasts Wierwille relied upon, but he did not add back the competitive discounts and he accounted for the traditional fluctuation of the underwriting cycle, a phenomenon affecting the health care industry but ignored by Wierwille.[34] Feldstein Tr. (11/19/01) 1357:4–1359:15; Defense Exh. 86. Dr. Feldstein's projected underwriting profit margin was less than one percent on average for the 15 year period before January 1, 1987. Feldstein Tr.

(11/19/01) 1347:22–1348:9. That forecast was consistent with the industry's long term profit picture, with Trigon's own long term profit results and with the rather dismal view of the three year future reflected in the views expressed by Trigon's management, as approved by its Board. All of these factors further corroborate that Wierwille's profit margins are overstated and unreliable.

### (iii) The Addbacks Were Overstated

Additionally, assuming *arguendo* that the addbacks were proper, the United States correctly argues that the amounts of the so-called "addbacks" are overstated. Joint Exhibit 29 is a report prepared by Trigon's consultants related to the consolidation of the Richmond and Roanoke plans. The consultants reported:

Since the start of competition between BCBS–SWVA (since July 1983), BCBS–VA has experienced a gap of approximately $50–60 million between formula-derived prices and actual prices. *This probably overstates the actual "marketplace cost" of the competition to date.*

---

**34.** The record shows that profits of health insurance companies are subject to an industry-wide phenomenon known as the "underwriting cycle". It is a cyclical pattern of several years of positive underwriting profits followed by several years of underwriting losses. Perkins Tr. (11/12/01) 94:22–95:2. The underwriting cycle typically lasts six years-three years of gains followed by three years of losses. The underwriting cycle for any given company, however, can run longer than six years. White Tr. (11/13/01) 337:1–10. When Trigon began to focus resources on the underwriting cycle, its goal was not to erase it but simply to avoid the loss years. Cothran Tr. (11/12/01) 255:13–256:3; White Tr. (11/13/01) 337:11–21. The underwriting cycle continues to affect the profitability of health insurance carriers, including Trigon. Wood Tr. (11/15/01) 853:18–854:2.

Wierwille assumed that the underwriting cycle would be managed in the future. Wier-

wille testified that he assumed that the underwriting cycle would continue to affect Trigon's profits after January 1, 1987, but he believed that, after averaging out the ups and downs, Trigon would be left with his projected profit margin of 5.4 percent. Wierwille Tr. (11/14/01) 709:7–711:17. Accordingly, he projected that profit margin forward from 1991. Wierwille Tr. (11/14/01) 708:20–711:18. At trial, Cothran made clear that she recognized the existence of the cycle in the early 1980s, and began taking steps to address it then. Cothran Tr. (11/12/01) 253:19–254:1. Those efforts were complicated by the Richmond–Roanoke competition. Cothran Tr. (11/12/01) 254:2–255:3. Wierwille's assumptions regarding the underwriting cycle are not consistent with the evidence indicating that, through the 1980s, Trigon recognized that its underwriting results were being affected by the cycle. *See, e.g.,* Plaintiff's Exh. 51 at TR02040210–211.

*More realistically, the marketplace cost of the competition should be determined by the difference between actual prices and the "general competitive level" that would have existed without inter-plan competition.* It would be difficult to reconstruct with precision a hypothetical general competitive level, and then calculate an accurate cost of the competition for BCBS–VA. However, *it is realistic to believe that at least one-third of the shortfall, or at least $20 million, is related to inter-plan competition.*

TR22440084 (emphasis supplied; footnote omitted).

The United States argues that Joint Exhibit 29 recognizes that competitive discounts are part of the normal competitive environment. Adding the full amount of the "gap" recorded by Trigon between the formula-driven prices and the actual prices served to inflate its expected revenues. Further, the United States argues, Wierwille should have made, but did not make, some allowance for competitive discounts in the future. It must be noted that the report is limited to a discussion of the impact of competitive discounts on the Richmond plan, and does not quantify the impact on the combined company. Furthermore, Trigon argues that Wierwille did not rely on the consultant's report for his competitive discount information, but rather, he relied on Joint Exhibit 1. *See Post–Trial Reply,* at 21.

According to Trigon, Joint Exhibit 1 makes clear that the competitive discount numbers it gives are projections of the lingering impact (going forward from December 1986) of Richmond–Roanoke competitive discounts, that they are combined company numbers, and that they are wholly attributable to the interplan competition and not other "general" competitive pressures. *See Plaintiff's Post–Trial Reply Brief,* at 21 (citing Joint Exh. 1). The Court does not interpret the document in this manner. Joint Exhibit 1 states explicitly:

> In all three scenarios[, the most likely case, the best case and the worst case,] rate discounts initiated during the Richmond–Roanoke competition are being phased out over three renewal years and continue to depress the underwriting results. These discounts are expected to peak at $52 million (4.0% of premium) in 1986, before declining to $30 million (2.2%) in 1987 and $13 million (0.7%) in 1988.

*Id.* The forecasts do not state or infer that the discounts are wholly attributable to the interplan competition, exclusive of other general competitive pressures. Thus, adding back the entire "gap" between formula-driven prices and the actual prices still inflates expected revenues. Plaintiff's Exhibit 32 (Trigon's 1987 Business Plan) at TR01041119, the other document Wierwille allegedly relied on in making his projections, also suffers from the same problems as the two documents cited above. It appears that Wierwille actually relied on Plaintiff's Exhibit 32 instead of Joint Exhibit 1.

On top of all of the problems respecting the premium discounts, Joint Exhibit 1 and Plaintiff's Exhibit 32 are inconsistent in the calculation of discounts for the years at issue. The premium discount for 1986 in Plaintiff's Exhibit 32 was $53 million instead of the $52 million figure in the projections of Joint Exhibit 1, $39 million in 1987 instead of the $30 million from the projections in Joint Exhibit 1, and $27 million in 1988 instead of $13 million. The projections are widely varied. It is apparent to the Court that all of the referenced documents suffer from the same problem, namely, the figures are not projections of discounts granted exclusively because of the interplan competition without regard to any normal level of competition. For

instance, in Plaintiff's Exhibit 32 (Trigon's 1987 Business Plan) at TR01041119, the projected discounts continued in 1989 and 1990 and in the paragraph above the graph entitled "COMPETITIVE DISCOUNTS" it states: "Discounting done as part of the interplan competition is zero by 1989. Discounts in 1989 and later represent pricing considerations allowed in the sale of [particular health care service plans]." It is clear from the document that Wierwille seemed to have actually relied on (Plaintiff's Exhibit 32), that discounts would (1) continue beyond 1988, and (2) that the discounts other than those associated with the interplan competition were in existence and should have been, but were not, considered by Wierwille.

Furthermore, the text of the documents relied on by Wierwille do not make projections beyond 1990, nor do they establish the conclusion that profit will be at 5.4 percent from 1992 on, the level forecast by Wierwille. Wierwille (11/14/01) 714:9–18. For 1990 and beyond, Wierwille assumed that Trigon would grow and, solely as a result of that growth, its profit margins would increase because it was assumed that premiums would grow faster than administrative costs. Wierwille Tr. (11/14/01) 706:17–707:1 and 707:16–708:19. He then assumed that Trigon would reach a stabilized profit margin for all of its lines of business averaging 5.4 percent. *Id.*

The record here establishes that premium discounts of varying magnitude were part of the heath care industry's business reality at the time of the valuation and were expected to continue. Legal obligations, competitive factors, a drastically evolving industry and state government pressure made it virtually impossible to justify adding back the premium discounts and certainly not to the amount that Wierwille restored to premium income to get his profit margins.

### (iv) Price Sensitivity And Other Final Considerations

Because of the interplan competition, Trigon's customer base had become extremely price sensitive. Because of the ongoing escalation in health care costs, it was expected that customers' price sensitivity would become even more acute. Discussing health insurance as of January 1, 1987, Dr. Paul Feldstein testified that "it was very price sensitive because a lot of times you could not tell much difference between health plans other than price.... So price sensitivity is very high particularly when the consumer or the employee has an incentive to chose." Feldstein Tr. (11/19/01) 1350:10–18.

Trigon's executives echoed these concerns at trial. Carl Slone, Trigon's vice-president of sales in 1987, testified that price was a major reason why groups discontinued their relationship with Trigon. Slone Tr. (11/13/01) 281:25–282:5 and 313:19–21. He further testified that small business groups are very volatile regarding price. Slone Tr. (11/13/01) 313:22–4. Price is the primary reason why they discontinue their relationships with Trigon. Slone Tr. (11/13/01) 313:25–314:2. *See also* Slone Tr. 304:13–19 (The small business market is "very, very price sensitive").[35]

---

**35.** Small business contracts accounted for the majority of Trigon's business. Wierwille's valuation schedules, set forth in Plaintiff's Exhibit 282, include 290 pages listing small business contracts. Community Rated contracts, *i.e.,* groups with 15 to 50 insureds, was the next largest line of business with 133 pages; Local Experience Rated contracts, *i.e.,* groups with 50 or more insureds, had 33 pages; Local Cost Plus had five pages; Par National had five pages; Control National had two pages; Large Groups–Local Experience Rated had one page; Large Groups–Local Cost Plus had one page; and Large Groups–Control National had one page. *See* Perkins Tr. (11/12/01) 75:1–76:6 for the size of the groups.

Cothran testified that, when she wrote to Consolidated Healthcare's Board of Directors in 1985, she expected a greater price sensitivity by insureds. Cothran Tr. (11/12/01) 232:17–21; Joint Exh. 6. She still held this view in 1986 when she wrote another letter to the Board. Cothran Tr. (11/12/01) 234:23–235:10; Defense Exh. 9 at TR22330319.[36] Reflecting her concern over price sensitivity, Cothran wrote that, "this shift [to managed care] will be primarily driven by the out-of-pocket cost or the size of the monthly contribution which must be borne by employees for their health plans." Defense Exh. 9 at TR22330319. Because of the price sensitivity, Trigon could not have increased its premiums quickly without significant attrition.

As discussed in the analysis of Wierwille's lifing computations, Trigon was also confronted with the transition to managed care led by HMOs. The move to managed care was expected to create anti-selection, increasing the risk and costs associated with its traditional contracts because the healthier individuals would migrate to the managed care products, leaving less healthy, more costly individuals in the traditional plans.

Additionally, Trigon was confronting new federal income tax costs and a possible state tax on insurance premiums, from which it previously had been exempt. Trigon's December 18, 1986, projections state that the "[l]oss of Federal Income Tax and possible loss of state premium tax exemptions threaten our historical cost advantage in these areas." Joint Exh. 1 at TR01090826. A February 12, 1986, presentation to CHI's board of directors warned of protracted "price wars" and went on to state that "[t]he problem will be exacerbated with the incipient imposition of Federal income taxes." Defense Exh. 18 at TR22330187.

None of these factors support the rosy profit picture on which Wierwille fastens the income stream projection in his valuation opinion.

### e. Conclusion Respecting Valuation Of The Subscriber Contracts

In conclusion, it is quite clear that the methodology used by Wierwille, in concept and properly applied, is capable of identifying a fair market value for the subscriber contracts. However, on this record, the facts foreclose a finding that Trigon has met, by a preponderance of the evidence, its burden to show that the valuation here at issue is accurate and reliable. First, the number of contracts is of questionable validity. Second, Wierwille did not cross-check the valuation figures obtained by using the income approach and the explanation for the failure to have done so was neither credible nor convincing. Third, the results of the income approach have varied widely among the Blue Cross/Blue Shield organizations similarly situated and even between the two valuations made for the particular contracts at issue here, further indicating its potential for unreliability depending on the quality of the valuation inputs. Fourth, because of the questionable data base, the lack of cross-checking and the widely varied results among Blue Cross/Blue Shield organizations and valuation experts, it was of critical, outcome determinative importance that the inputs used to arrive at the valuation were accurate and reliable; and, for the reasons stated above, the critical inputs here—the lifing analysis and the profit projections—simply do not square with the facts of record and thus they

---

**36.** The letter states that "[e]xpected is a continuation of—a heavier emphasis on the 'price' of the health benefits product. . . ." Defense Exh. TR22330319.

cannot be considered accurate or reliable. For the reasons set forth in this Section, the Court finds that Trigon has not met its burden of proving by a preponderance of the evidence the reasonably accurate value for the subscriber contracts.

## 2. Valuation Of The Provider Contracts

When cataloging Trigon's assets in 1987 and 1988, Meyer identified physician and hospital (or facility) provider contracts the company owned on January 1, 1987. At the time, Trigon had two types of physician provider contracts, KeyCare and Participating. *See* Plaintiff's Exh. 91 (illustrative Participating and KeyCare contracts). A physician might have either one of these contracts or both. The KeyCare contracts owned by Trigon on January 1, 1987, are identified in Plaintiff's Exhibit 72. Stip., ¶ 13. The Participating contracts owned by Trigon on that date are identified in Plaintiff's Exhibit 73. Stip., ¶ 14. As evidence of the physician provider contracts in existence on January 1, 1987, Trigon submitted Plaintiff's Exhibits 72, 73 and 74. A complete list of the physician provider contracts valued by Wierwille is contained in Plaintiff's Exhibit 282, Appendix B.

Trigon also owned provider contracts with hospital providers. Only one of those contracts, the one with Smyth County Hospital, is at issue in this case because that is the only facility that completely severed its contractual relationship with Trigon during the relevant time period. The contract Trigon had with Smyth County Hospital on January 1, 1987, is marked as Plaintiff's Exhibit 92.

 Wierwille relied on the "cost approach" to value Trigon's provider contracts.[37] Wierwille Tr. (11/14/01) 571:15–572:5. In doing so, Wierwille attempted to estimate the cost of entering into new contracts with each of the providers in Trigon's network as of January 1, 1987. *Id.* For the physician contracts, he was provided with estimates of the time it took a Trigon employee to check a physician's credentials, interview the physician and actually enter into a contract. Wierwille Tr. (11/14/01) 571:18–572:10; Defense Exh. 103 at TR46012224 (Wierwille Expert Report at Exhibit VII.2). No other information was used to arrive at the cost of replacing a physician contract. *Id.* He then considered that figure to be the fair market value of the contract. *Id.*

For the hospital and facility provider contracts, Wierwille was given the costs associated with obtaining hospital contracts, home health facility contracts and nursing facility contracts, as well as the total numbers of such contracts. *See* Defense Exh. 103 at TR46012225–6 (Wierwille Expert Report at Exhibit VII.3 and Exhibit VII.4). He also added the Uniform Pre–Payment amount Trigon was required to deposit and obtained the values opined in Defense Exhibit 103.

Dr. Foster pointed out that, as with the subscriber contracts, Wierwille did not use multiple valuation methods to cross-check the results obtained by using the cost method. Foster Tr. (11/16/01) 1249:22–1250:7. According to Dr. Foster, the income approach could have been employed as a cross-checking device. Foster Tr. (11/16/01) 1249:22–1250:7. That view is corroborated by the fact that, in Arthur Andersen's 1988 valuation of the provider contracts, Arthur Andersen utilized the income approach, taking the cost savings of

---

**37.** There are no known sales of provider contracts separate from sales of entire health insurance companies, either singly or in blocks. In this regard, Trigon acknowledged that it was unlikely that any such sales would occur. Again, as noted earlier, this does not necessarily preclude a determination of fair market value.

the discounts as the income stream, but the results obtained by Arthur Andersen are of questionable reliability.

Wierwille, however, explained that the cost savings in provider contracts is "passed through" to the customers, so that Trigon does not earn a profit on the provider contracts. Wierwille's explanation is in congruity with common economic sense. However, when the savings are passed onto the customer, the amount of premiums they pay is reduced and therefore Trigon becomes a more attractive option for insurance. There is certainly a benefit to Trigon in attracting customers as a result of lower premiums. Nonetheless, on the facts as respects the provider contracts, their valuation using the income approach was not an endeavor that reasonably could have been undertaken under the circumstances, because the ability to attract customers as a result of lower premiums is too speculative to use as the predicate for assessing income.

Given the overall lack of disagreement by the United States as to the valuation methodology used to value the provider contracts, the fact that all parties appear to concede that fair market value can be determined by this approach, the Court finds that the approach used was proper. However, the data used in establishing the values must be accurate and therefore carefully scrutinized.

Wierwille opines that:

(1) To replace the physician provider contracts Trigon owned on January 1, 1987, Trigon would have incurred salary, benefit, overhead, and other costs. Between January 1, 1987, and December 31, 1995, Trigon lost 3,381 of the physician provider contracts it owned on January 1, 1987. The total fair market value of those contracts on January 1, 1987, as determined by Wierwille, was $207,896.

(2) On January 1, 1987, Trigon had a facility provider contract in place with Smyth County Community Hospital. To replace the Smyth County Community Hospital contract on January 1, 1987, Trigon would have incurred salary, benefit, overhead, and other costs. As of January 1, 1987, to replace the Smyth County Community Hospital contract, Trigon would have incurred costs of $36,507. Thus, the fair market value of the Smyth County contract was $36,507.

What Wierwille has done here is make an attempt to estimate the cost of entering into new contracts with each of the providers in Trigon's network as of January 1, 1987. Wierwille Tr. (11/14/01) 571:15–572:5. In making this estimate, Wierwille relied entirely on representations from Trigon's management. Wierwille Tr. (11/14/01) 744:8–16; Defense Exh. 103 at TR46012224 n. 1 and TR46012225. n. 1 (Wierwille Expert Report at Exhibit VII.2 n. 1 and Exhibit VII.3 n. 1). The information forming the basis of Wierwille's opinion is an estimate by Trigon employees of the time required back on January 1, 1987, as to how long it will take to obtain new contracts. The evidence was not based upon records or other documentation, rather, it was anecdotal:

THE COURT: Did they have any documents that showed that it took—that what their average was per group and how much time it took them per group to do the job?

[WIERWILLE]: No, this information was communicated by individuals in the provider department based upon their experience.

THE COURT: So it was anecdotal, basically.

[WIERWILLE]: It was.

Wierwille Tr. (11/14/01) 578:14–23. Trigon computed the initial total cost it had incurred in establishing the provider contracts and, in essence, it seems that the only act Wierwille performed was to bless the figures with his name and divide the total cost by the total number of providers. He did not confirm the numbers himself through verifiable documentation. Furthermore, the numbers used were cost *estimates* for 1987, made by Trigon personnel in the year 2000. Wierwille Tr. (11/14/01) 576:19–577:6. Wierwille did not verify the information that was provided to him (Wierwille Tr. (11/14/01) 744:11–16), nor did he search Trigon's books and records using his keen expertise to discern the actual costs associated with establishing new contracts with physician and facility providers.

Given these fundamental defects, the Court cannot accept Wierwille's valuation of the provider contracts, as tendered, as proof by a preponderance of the evidence that the values are an accurate and reliable measure of the provider contracts' fair market value. The data underlying Wierwille's valuation are unreliable and unverified, thus, while the methodology utilized may be correct, the end result is unacceptable.

## G. The Asserted Lack Of Independence Of The Expert Witnesses For The United States And Trigon's Negative Inference Argument

The factual challenge of the United States to the Wierwille valuation is an attack upon the method used by Wierwille and the reliability of certain components that affect application of the method used. These attacks, in part, are based on the testimony of five experts: Dr. Bruce A. Palmer, an expert in financial accounting; Dr. John M. Lacey, an expert in accounting and tax computation; Mr. Michael D. Pugh, an expert in health industry operations; Dr. George Foster, an expert in valuation; and Dr. Paul J. Feldstein, an expert health care economist. For most of the course of this litigation, the work of these experts was directed by Analysis Group/Economics ("AG/E"). The conduct and effect of AG/E's actions and the Court's view thereof are set forth in *Trigon Insurance Co. v. United States*, 204 F.R.D. 277 (E.D.Va.2001). At the end of that opinion, the Court advised that Trigon might be entitled to certain adverse inferences respecting the testimony of the five experts to be called as witnesses by the United States.

The Court has heard the testimony of those witnesses about their relationship with AG/E and their work in this action, as well the substance of their testimony. And, the Court is fully mindful of the criticism levied in the previous opinion against AG/E. But, having assessed first-hand the credibility of these five witnesses, in perspective of the record, as a whole, the Court finds, as a matter of fact, that no adverse inference against any of them is appropriate.

Thus, the Court credits the testimony of each of those five witnesses as reflective of their own independent opinions and as reliable, notwithstanding the conduct of AG/E, of which the Court continues to disapprove for the reasons stated in the previous opinion. A principal reason for finding that no adverse inference is called for is that the opinions and criticisms offered by each of these witnesses at trial finds support in parts of the record as to which AG/E had no input. And, all five witnesses offered sound reasons, tethered to the record and consonant with common sense, in support of their views.

Unlike Wierwille, the experts of the United States did not ignore the realities of the environment faced by Trigon at the relevant time. Nor did they offer opinions that could not be squared with the views of

Trigon's management. Nor did they change their testimony at trial on any key aspect of the evidence they gave. As described elsewhere in this opinion, all of those defects, and more, are found in the opinion testimony of Wierwille.

## CONCLUSION.

For the foregoing reasons, Trigon is not entitled to the deductions at issue here for the years 1987 through 1995 and thus and is not entitled to a tax refund from the United States. Hence, judgment shall be entered in favor of the United States.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.